# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Nelson v. Quarles & Brady, LLP*, 2013 IL App (1st) 123122

---

| | |
|---|---|
| Appellate Court Caption | KENNETH A. NELSON, Plaintiff-Appellant, v. QUARLES AND BRADY, LLP, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-3122 |
| Filed | September 30, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a legal malpractice action arising from defendant's representation of plaintiff in a federal case concerning a stock purchase agreement between plaintiff and his former partner, the  trial court erred in dismissing plaintiff's third amended complaint for failing to state a cause of action, since it could not be said as a matter of law that plaintiff could not prove any facts that would allow a jury to find that plaintiff's damages were proximately caused by defendant's failure to raise additional arguments, and defendant's conduct did not constitute an error of judgment for which it was immune from liability. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-2107; the Hon. Jeffrey Lawrence, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Stewart M. Weltman, of Stewart M. Weltman LLC, and Martin J. Oberman, of Law Offices of Martin J. Oberman, both of Chicago, for appellant.

Michael T. Trucco and Megan T. Hughes, both of Stamos & Trucco LLP, of Chicago, for appellee.

Panel

JUSTICE EPSTEIN delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1 This case involves an action for legal malpractice filed by plaintiff Kenneth A. Nelson against defendant Quarles & Brady, LLP, the law firm that represented him in a federal action involving a dispute concerning the terms of a stock purchase agreement between plaintiff and his former business partner, Richard Curia. Plaintiff filed this appeal after the circuit court dismissed his third amended complaint with prejudice pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)) for failing to state a cause of action. For the reasons that follow, we reverse and remand.

¶ 2         BACKGROUND

¶ 3 For purposes of our review of the ruling on defendant's motion to dismiss, where the legal sufficiency of the complaint has been attacked, we accept as true the allegations in plaintiff's third amended complaint. See *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 384 (2008); *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 293 (1998). We also interpret the allegations in the light most favorable to plaintiff. *Imperial Apparel, Ltd.*, 227 Ill. 2d at 384.

¶ 4    Underlying Contractual Dispute Between Plaintiff and Richard Curia

¶ 5 According to the allegations of plaintiff's third amended complaint, he was the beneficial owner of a majority of shares in two corporations that owned two car dealerships, Ken Nelson AutoPlaza, Inc. (AutoPlaza), and Ken Nelson AutoMall, Inc. (AutoMall). A dispute arose between plaintiff and Richard Curia, with whom plaintiff had contracts that included a written 1989 stock purchase agreement, a written 1993 modification agreement, and an oral 2004 agreement. The dispute involved Curia's attempt to exercise certain options in the 1989 agreement. Curia claimed it entitled him to purchase shares in the two car dealerships, which

would force plaintiff to sell his majority interests in the dealerships and the land upon which they were situated. Plaintiff claimed that the 1989 agreement was inoperative and unenforceable. Specifically, plaintiff alleged that, within a month of its execution, both he and Curia "embarked on a course of conduct over a period of years that materially departed from the terms of the 1989 [agreement] in deed and words, all of which made it impossible for the three 1989 [agreement's] options to be exercised in accordance with their terms."

¶ 6      The 1989 agreement was attached to plaintiff's complaint. As plaintiff notes, the agreement recited that plaintiff was the sole owner of all of the outstanding shares of capital stock in the dealerships, and that, as of that date, AutoPlaza had 8,180 shares, and AutoMall had 1,200 shares. The 1989 agreement provided that plaintiff agreed "to sell, assign, transfer, and convey to [Curia] all right, title and interest in and to 1000 shares of capital stock in [AutoPlaza] and 144 shares of capital stock in [AutoMall]." The purchase price was $100,000 and the closing date was to be on or before February 15, 1989. Plaintiff notes that this would have resulted in plaintiff retaining 7,180 shares of Plaza stock and 1,056 shares of Mall stock.

¶ 7      The 1989 agreement also gave Curia a series of three additional, successive options to purchase the remaining shares. Specifically, paragraph 4 provided that Curia had an initial option to purchase an additional 1,000 shares of capital stock in AutoPlaza and 144 shares of capital stock in AutoMall for an additional $100,000. Plaintiff notes that this would have resulted in plaintiff retaining 6,180 shares of Plaza stock and 912 shares of Mall stock, while Curia would have owned 2,000 shares of Plaza stock and 288 shares of Mall stock. After exercising this initial option, Curia could exercise the next option.

¶ 8      The second option provided that Curia could "purchase from [plaintiff] an additional 2,009 shares of capital stock of [AutoPlaza] and 300 shares of capital stock in [AutoMall] which shares with previous purchased shares would represent 49% of the issued and outstanding shares of capital stock in said corporations." The purchase price for these shares was to be based on a defined valuation formula and was to "be determined by adding to the total net worth of each corporation a sum representing fifty (50) per cent of the total accumulated depreciation and including the 'LIFO' (last in first out) reserve plus twenty (20) per cent of the total 'LIFO' reserve and dividing the total sum thereof by the number of shares in each corporation." This formula required reference to the monthly operating reports issued by General Motors Corporation and Nissan Motor Corporation.

¶ 9      As to the third and final option, paragraph 4 stated: "After exercising the first two options to purchase as provided in this Agreement, [Curia] shall have a third option to purchase from [plaintiff] the remaining 4,171 shares of stock in [AutoPlaza] and 612 shares of stock in [AutoMall], provided that [Curia] also offer to purchase the land and four buildings of [AutoPlaza]." The purchase price of the shares, similar to that of the shares described in the second option, was to be based on a valuation formula. The purchase price of the land and the buildings was to be determined by an appraiser.

¶ 10      The 1989 agreement required Curia to provide notice in writing of his election to exercise each option. The contract also required that he make a lump-sum cash payment to plaintiff of the amount required under the formula 60 days after notice was sent.

¶ 11 Curia subsequently did not pay the initial $100,000 for 1,000 shares of AutoPlaza and 144 shares of AutoMall. Instead, at some point (the complaint contains no date), Curia paid $200,000. Apparently, at some point (the complaint contains no date), "each corporation was re-capitalized such that thereafter [plaintiff] owned 8,000 shares of [AutoPlaza] (instead of 7,180 as specified in the 1989 [agreement]), and 1,200 shares of [AutoMall] (versus 932 specified in the 1989 [agreement])." Curia then "owned 2,000 shares of [AutoPlaza] (versus 1,000 specified in the 1989 [agreement]) and 300 shares of [AutoMall] (versus 288 specified in the 1989 [agreement]).

¶ 12 In 1993, plaintiff and Curia executed a modification agreement (the 1993 Modification Agreement), which was also attached to plaintiff's complaint. The agreement recited, in part, that "a mutual mistake was made by [plaintiff] and Curia in determining the fair market value of the capital stock of said corporations and in evaluating the minority interest in said corporations which were intended to be sold by [plaintiff] and purchased by Curia pursuant to paragraph 1 and paragraph 4 of [the 1989 agreement]." The 1993 Modification Agreement further altered the number of shares issued and outstanding and the amounts owned by each which, plaintiff alleges, underscored "the impossibility of transferring the number of shares specified in the 1989 [agreement] options."

¶ 13 Plaintiff alleges that, in the 1993 Modification Agreement, he and Curia "agreed that the corporations would authorize and issue additional stock so that Curia, without the payment of additional monies, would approximately double his ownership interest in each corporation." Pursuant to this agreement, Curia obtained an additional 5,306 shares in AutoPlaza (which increased his ownership interest to 47.7%) and an additional 480 shares in AutoMall (which increased his ownership interest to 43.3%).

¶ 14 The 1993 Modification Agreement also contained a paragraph 5, entitled "Purchase of Additional Shares," which stated:

"Curia shall have the right to purchase additional shares of stock in said corporations upon those terms and conditions subsequently agreed upon by the parties hereto. The purchase price for said additional shares of stock shall be determined by adding to the total net worth of each corporation a figure representing the accumulated 'LIFO' (last in first out) reserve and dividing the total sum thereof by the number of shares of each corporation."

Plaintiff alleges that the effect of this paragraph was that "any future purchase of shares by Curia after 1989 could not be taken pursuant to the 1989 [agreement] because exercise of the 1989 options was no longer possible because both the substantial changes in the number of shares issued and outstanding in each corporation and the substantial changes in the number of shares owned by [plaintiff] and Curia were completely different from and inconsistent with the 1989 [agreement]." Plaintiff further alleges: "Because pursuant to the 1993 Modification, Curia received substantial additional shares in each corporation without paying any additional monies, as a matter of law and fact, after the 1993 Modification, the 1989 [agreement's] Options were completely inoperative and incapable of being exercised in accordance with their own terms." As an example, plaintiff notes that if Curia had demanded plaintiff sell him 2,009 shares in AutoPlaza–pursuant to the second option in the 1989

agreement–that sale would have resulted in Curia owning more than 49% of AutoPlaza. This result, plaintiff contends, would have made Curia a majority owner and was "clearly contrary to the terms of the option." Plaintiff further states: "Likewise, if, in order to avoid becoming a majority owner, Curia offered to purchase less than the 2,009 shares required under the 1989 [agreement's] Second Option, this would have been contrary to the express terms of the option language and ths would have rendered such an exercise inoperative."

¶ 15    In 2004, plaintiff and Curia began discussing plaintiff's selling all of his remaining stock so that Curia would own 100% of both corporations. According to plaintiff, in July 2004, they entered into an oral agreement that Curia would purchase all of plaintiff's remaining stock for $4.2 million. Plaintiff and Curia agreed that a closing would take place prior to December 31, 2004. They also agreed to, and did, undertake several actions to implement the agreement which included: (1) obtaining corporate resolutions from both boards to accept the oral agreement; (2) Curia applying for, and receiving, a loan commitment from Fifth Third Bank for $4.2 million to buy out plaintiff's remaining ownership interest; and (3) plaintiff's writing letters to the various automobile manufacturers, as required by the dealerships' franchise agreements, informing them of the corporate resolutions and seeking approval for the transfer of ownership.

¶ 16    Subsequently, although plaintiff was ready, willing and able to complete the sale, Curia failed to tender the $4.2 million and refused to perform. Instead, on March 2, 2005, Curia sent a "Notice of Exercise of Option" informing plaintiff that he was exercising the second option under the 1989 agreement. By doing so, Curia was attempting to acquire all of plaintiff's remaining shares for far less that the $4.2 million that the 2004 Oral Agreement required. Curia stated that he had "previously exercised [his] first option," referring to the $200,000 payment he had already made. Curia offered to purchase and pay for 193 shares of AutoPlaza stock and 170 shares of AutoMall stock. However, as plaintiff notes, the second option in the 1989 agreement required Curia to purchase and pay for 2,009 shares in AutoPlaza and 300 shares in AutoMall.

¶ 17    On March 3, 2005, Curia sent plaintiff a second notice seeking to exercise the third option of the 1989 agreement. He did not seek to purchase the number of shares delineated in the agreement but did seek to purchase all of plaintiff's remaining shares, the land, and the buildings as set forth in the third option. Plaintiff's position was that Curia's attempts were ineffective because the 1989 agreement's options were no longer operative, and that Curia breached the 2004 oral agreement.

¶ 18             Plaintiff's Legal Malpractice Action Against Defendant

¶ 19    On or about March 9, 2005, plaintiff retained defendant to represent him in this dispute with Curia to, among other things, protect his stock ownership interests in the dealerships, enforce plaintiff's contractual rights, and prevent Curia from attempting to enforce Curia's purported rights. Shortly after plaintiff retained defendant, it filed a declaratory judgment action in federal court against Curia seeking to have the court declare that Curia could not exercise the options in the 1989 Agreement. Curia then initiated a separate action against plaintiff in the same court seeking, among other things, specific performance of the 1989

agreement to force plaintiff to sell all of his shares in the dealerships.

¶ 20    On February 6, 2006, the district court entered partial summary judgment in Curia's favor, holding that he could exercise the options in the 1989 agreement. On June 27, 2007, the district court entered an additional partial summary judgment in Curia's favor, ordering plaintiff to sell all of his remaining shares in AutoPlaza to Curia. On July 13, 2007, defendant filed a motion to stay the June 27, 2007 order. Defendant did not recommend that plaintiff post a bond pending appeal. On July 18, 2007, defendant filed a notice of appeal of the decisions in Curia's favor. On August 10, 2007, the district court denied the motion to stay. On September 5, 2007, defendant filed a motion to stay the district court's order and, again, did not offer to post a bond. The Seventh Circuit denied the motion to stay.

¶ 21    While the appeal was pending in the Seventh Circuit, pursuant to the district court orders, plaintiff was forced to, and did, sell all of his remaining shares to Curia on or about April 30, 2008. Plaintiff then discharged defendant and hired new counsel to represent him in his appeal. On June 3, 2008, the court granted plaintiff's motion for substitution of attorney. On November 20, 2009, the Seventh Circuit, *sua sponte*, decided that the contract was ambiguous, reversed the district court's judgment, and remanded the case.[1]

¶ 22    During the 1½ years between the time Curia obtained plaintiff's shares on April 30, 2008, and the Seventh Circuit's decision, Curia had obtained substantial loans and encumbered AutoPlaza's[2] assets by using them as security for the loans. Plaintiff alleges that, as a result, Curia materially and negatively impaired AutoPlaza's assets and there was no practical means for plaintiff to undo the sale of his shares to Curia. Plaintiff settled with Curia to minimize his continued losses and was unable to regain his majority ownership of AutoPlaza.

¶ 23    Plaintiff filed the instant legal malpractice action against defendant, alleging that, during the course of representing him, defendant breached its duties to him in that it "either negligently and carelessly omitted and failed to perform, or negligently and carelessly performed, certain services." Plaintiff further alleged that defendant's "negligent and careless conduct included but is not limited to the complete failure to assert a meritorious cause of action against Curia on [plaintiff's] behalf and the complete failure to assert meritorious defenses to Curia's alleged causes of action."

¶ 24    Plaintiff subsequently amended his complaint. After a hearing, the trial court dismissed plaintiff's second amended complaint for failure to state a cause of action. Plaintiff then filed a motion to reconsider or, in the alternative, for leave to file a third amended complaint. Plaintiff incorporated into the third amended complaint the affidavit of a legal malpractice expert, Edward T. Joyce, a Chicago attorney with over 45 years of experience in complex commercial litigation.

¶ 25    On October 17, 2012, after a hearing, the trial court allowed plaintiff's motion to

---

[1]*Curia v. Nelson*, 587 F.3d 824 (7th Cir. 2009).

[2]Curia and plaintiff apparently agree that Curia's right to purchase any remaining shares in AutoMall was effectively terminated when they entered into a separate modification agreement in 1997 involving a third party's purchase of stock. *Curia v. Nelson*, 587 F.3d at 827.

reconsider and allowed him to file a third amended complaint, which the court dismissed. The court decided, as a matter of law, that defendant's actions constituted nonactionable errors of judgment, and not professional negligence. Plaintiff now appeals.

¶ 26                                              ANALYSIS

¶ 27     A motion to dismiss for failure to state a cause of action pursuant to section 2-615 attacks "the legal sufficiency of a complaint based on defects apparent on its face." *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). "A circuit court should grant a section 2-615 motion to dismiss only if it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief." (Internal quotation marks omitted.) *Estate of Powell v. John C. Wunsch, P.C.*, 2013 IL App (1st) 121854, ¶ 15. At this pleading stage, a plaintiff is not required to prove his case and need only allege sufficient facts to state all elements of the cause of action. *Fox v. Seiden*, 382 Ill. App. 3d 288, 294 (2008). When reviewing a section 2-615 motion, we accept as true "[a]ll well-pleaded facts and reasonable inferences that can be drawn from those facts." *Tuite v. Corbitt*, 224 Ill. 2d 490, 509 (2006). We also interpret the allegations in the complaint in the light most favorable to the plaintiff. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 13. Our review of the circuit court's order granting the section 2-615 motion to dismiss is *de novo. Id.*

¶ 28     "To state a cause of action for legal malpractice, the plaintiff must allege facts to establish (1) the defendant attorney owed the plaintiff client a duty of due care arising from an attorney-client relationship, (2) the attorney breached that duty, (3) the client suffered an injury in the form of actual damages, and (4) the actual damages resulted as a proximate cause of the breach." *Fox v. Seiden*, 382 Ill. App. 3d at 294. A legal malpractice suit is by its nature dependent upon a predicate lawsuit. *Claire Associates v. Pontikes*, 151 Ill. App. 3d 116, 122 (1986). Thus, a legal malpractice claim presents a "case within a case." *Id.* "[N]o malpractice exists unless counsel's negligence has resulted in the loss of an underlying cause of action, or the loss of a meritorious defense if the attorney was defending in the underlying suit." *Id.*

¶ 29     By granting defendant's motion to dismiss, the trial court decided that, as a matter of law, defendant's conduct constituted, at most, a mere error of judgment and not professional negligence. Plaintiff now argues that, since he attached an affidavit of a legal expert to his third amended complaint, a factual issue arose that precluded the trial court from dismissing his complaint. He contends that the court erred in deciding as a matter of law that defendant's failures to assert plaintiff's meritorious defenses were mere "errors of judgment."

¶ 30     "In Illinois the question of whether a lawyer has exercised a reasonable degree of care and skill in representing and advising his client has always been one of fact ***." *Brown v. Gitlin*, 19 Ill. App. 3d 1018, 1020 (1974); see also *Keef v. Widuch*, 321 Ill. App. 3d 571, 577-78 (2001) (Whether a duty is owed is a question of law, but "whether an attorney breached a duty of care owed to a client is a question of fact."); *Mayol v. Summers, Watson & Kimpel*, 223 Ill. App. 3d 794, 806 (1992) ("Whether an attorney has exercised a reasonable degree of care and skill is a question of fact."); *Spivack, Shulman & Goldman v. Foremost Liquor Store, Inc.*, 124 Ill. App. 3d 676, 683-84 (1984) (same). Moreover, this question of fact must

generally be determined through expert testimony and usually cannot be decided as a matter of law. *Gelsomino v. Gorov*, 149 Ill. App. 3d 809, 814 (1986); see also *Barth v. Reagan*, 139 Ill. 2d 399, 407 (1990) ("[T]he standard of care against which the attorney defendant's conduct will be measured must generally be established through expert testimony."); *Mayol*, 223 Ill. App. 3d at 806 (same).

¶ 31    However, although the question of whether a lawyer has breached a duty to his client presents a factual question, courts have held that the issue may be decided as a matter of law under the doctrine of judgmental immunity which provides that "an attorney will generally be immune from liability, as a matter of law, for acts or omissions during the conduct of litigation, which are the result of an honest exercise of professional judgment." *McIntire v. Lee*, 816 A.2d 993, 1000 (N.H. 2003) (citing *Woodruff v. Tomlin*, 616 F.2d 924, 930 (6th Cir. 1980), and *Sun Valley Potatoes, Inc. v. Rosholt, Robertson & Tucker*, 981 P.2d 236, 239-40 (Idaho 1999)). Both parties here discuss the doctrine of "judgmental immunity," although no Illinois case has used the phrase. Nonetheless, we believe the doctrine is consistent with Illinois law, which distinguishes between negligence and mere errors of judgment. As the Illinois Supreme Court has stated: "It is clear that an attorney is liable to his client only when he fails to exercise a reasonable degree of care and skill; he is not liable for mere errors of judgment." *Smiley v. Manchester Insurance & Indemnity Co.*, 71 Ill. 2d 306, 313 (1978) (citing *Brown v. Gitlin*, 19 Ill. App. 3d 1018 (1974), citing *Stevens v. Walker & Dexter*, 55 Ill. 151 (1870)); accord *Kling v. Landry*, 292 Ill. App. 3d 329, 333 (1997); *O'Brien & Associates, P.C. v. Tim Thompson, Inc.*, 274 Ill. App. 3d 472, 480 (1995); *Howard v. Druckemiller*, 238 Ill. App. 3d 937 (1992); *Mayol*, 223 Ill. App. 3d at 806; *Land v. Auler*, 186 Ill. App. 3d 382, 384 (1989); *Shanley v. Barnett*, 168 Ill. App. 3d 799, 803 (1988); *Goldstein v. Lustig*, 154 Ill. App. 3d 595, 600 (1987); *Gelsomino v. Gorov*, 149 Ill. App. 3d 809, 813-14 (1986); *Segall v. Berkson*, 139 Ill. App. 3d 325, 328-29 (1985); *Gruse v. Belline*, 138 Ill. App. 3d 689, 695-96 (1985); *Spivack, Shulman & Goldman v. Foremost Liquor Store, Inc.*, 124 Ill. App. 3d 676, 683 (1984); *York v. Stiefel*, 109 Ill. App. 3d 342, 350 (1982), *aff'd in part & rev'd in part on other grounds*, 99 Ill. 2d 312 (1983); *Sheetz v. Morgan*, 98 Ill. App. 3d 794, 798 (1981); *Bronstein v. Kalcheim & Kalcheim, Ltd.*, 90 Ill. App. 3d 957, 959 (1980); *Practical Offset, Inc. v. Davis*, 83 Ill. App. 3d 566, 571-72 (1980); *Schmidt v. Hinshaw, Culbertson, Moelmann, Hoban & Fuller*, 75 Ill. App. 3d 516, 522 (1979); *Brainerd v. Kates*, 68 Ill. App. 3d 781, 786 (1979); *House v. Maddox*, 46 Ill. App. 3d 68 (1977); *Morrison v. Burnett*, 56 Ill. App. 129, 135 (1894). As one author has noted: "[T]he 'attorney judgment' defense [is] also commonly referred to as 'judgmental immunity' or the 'error of judgment' rule. Whatever the label, at its core, the rule dictates that attorneys do not breach their duty to clients, as a matter of law, when they make informed, good-faith tactical decisions." J. Mark Cooney, *Benching the Monday-Morning Quarterback: The "Attorney Judgment" Defense to Legal-Malpractice Claims*, 52 Wayne L. Rev. 1051, 1052 (2006).

¶ 32    Citing *Stevens v. Walker & Dexter*, defendant contends that "Illinois law has recognized for well over a century that an attorney cannot be held liable for an error in his thought process while actively engaging in his client's pursuits." The court in *Stevens v. Walker & Dexter* stated:

"But it must not be understood that an attorney is liable for every mistake that may occur in practice, and held responsible for the damages that may result. If the attorney acts with a proper degree of attention, with reasonable care, and to the best of his skill and knowledge, he will not be held responsible. Some allowance must always be made for the imperfection of human judgment." *Stevens v. Walker & Dexter*, 55 Ill. at 153.

However, despite this implicit adoption of the doctrine of judgmental immunity over a century ago, subsequent Illinois cases have not discussed the concept in great detail. As one court observed, the problem with the "error of judgment" concept has been pointed out in a legal malpractice treatise. See *Hunt v. Dresie*, 740 P.2d 1046, 1055 (Kan. 1987) (citing Ronald E. Mallen & Victor B. Levit, Legal Malpractice §§ 211, 215 (2d ed. 1981)). In that treatise, the authors noted: "Notwithstanding centuries of applying the error of judgment rule in attorney malpractice actions, the courts have not analyzed or defined the judgmental process being protected." Mallen, *supra* § 211, at 299; see also Cooney, *supra* at 1053 ("Courts often describe the rule in rather rote fashion, without fleshing out its nuances. A closer examination reveals that the rule has some decidedly blurry edges.").

¶ 33    The *Hunt* court also noted the authors' proposed analysis of errors of judgment:

" 'Nevertheless, a client is entitled to the benefit of an informed judgment. When the issue is one that is settled and can be identified through ordinary research and investigation techniques, an attorney should not be able to avoid liability by claiming the error was one of judgment. On the other hand, *when the proposition is one on which reasonable lawyers could disagree or which involves a choice of strategy*, an error of informed judgment should not be gauged by hindsight or second-guessed by an expert witness.' " (Emphasis added and omitted.) *Hunt v. Dresie*, 740 P.2d 1046, 1055 (Kan. 1987) (quoting Mallen, *supra* § 215, at 311).

¶ 34    The Supreme Court of Idaho, noting at that time that at least 13 jurisdictions had adopted the judgmental immunity rule, acknowledged that the "rule" as applied had been articulated in different ways. See *Sun Valley Potatoes, Inc. v. Rosholt, Robertson & Tucker*, 981 P.2d 236, 239 n.1 (Idaho 1999) (and cases cited therein). The *Sun Valley* court also stated:

"Rather than being a rule which grants some type of 'immunity' to attorneys, it appears to be nothing more than a recognition that if an attorney's actions could under no circumstances be held to be negligent, then a court may rule as a matter of law that there is no liability. As in any other negligence case, however, if there is a genuine issue of material fact about the reasonableness and care exercised by the attorney, then the issue must be submitted to the jury for determination." *Id.* at 240.

¶ 35    Our research has disclosed that courts in other jurisdictions have generally discussed judgmental immunity as applying to an attorney's decision in two situations: (1) where the law is unsettled; or (2) the decision is tactical. As one court explained: The "principle [of judgmental immunity] permits a court to determine, as a matter of law, that an attorney was not negligent based on an error in professional judgment because the law was unsettled on

the issue[3] *or* the attorney made a tactical decision from among equally viable alternatives." (Emphasis added.) *Merchant v. Kelly, Haglund, Garnsey & Kahn*, 874 F. Supp. 300, 304 (D. Colo. 1995) (citing *Halvorsen v. Ferguson*, 735 P.2d 675, 681 (Wash. Ct. App. 1986)).

¶ 36      However, one court has construed the rule as follows:

"Essentially, the judgmental immunity doctrine provides that *an informed professional judgment* made with reasonable care and skill cannot be the basis of a legal malpractice claim. Central to the doctrine [of attorney judgmental immunity] is the understanding that an attorney's judgmental immunity and an attorney's obligation to exercise reasonable care coexist such that an attorney's non-liability for strategic decisions 'is conditioned upon the attorney acting in good faith and upon an informed

---

[3]Several reported decisions addressing the doctrine of judgmental immunity have done so in the context of discussing an attorney's decision in an unsettled area of law. See, *e.g.*, *Evans v. Hamby*, 2011 Ark. 69, at 4, 378 S.W.3d 723 ("An attorney is not liable to a client when, acting in good faith, that attorney makes mere errors of judgment. [Citation.] Moreover, an attorney is not, as a matter of law, liable for a mistaken opinion on a point of law that has not been settled by the highest court of jurisdiction and on which reasonable attorneys may differ."); *Roberts v. Chimileski*, 2003 VT 10, ¶ 19, 175 Vt. 480, 820 A.2d 995 (" 'rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized' " (quoting 3 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 18.1, at 2 (5th ed. 2000))); *Blair v. Ing*, 21 P.3d 452, 464 (Haw. 2001) ("An attorney cannot be held liable for every mistake made in his or her practice, especially for an error as to a question of law on which reasonable doubt may be entertained by well-informed lawyers."); *Sun Valley*, 981 P.2d at 239-40 ("courts have *** held as a matter of law that an attorney is not liable for failing to correctly anticipate the ultimate resolution of an unsettled legal principal"); *Manley v. Brown*, 1999 OK 79, ¶ 9, 989 P.2d 448 ("[L]awyer who acts in good faith and in an honest belief that his advice and acts are well founded and in the best interest of his client is not answerable for a mere error of judgment when dealing with a point of law which has not been settled by a precedent-setting pronouncement and about which reasonable doubt may be entertained by well-informed lawyers. When the state of the law is doubtful or debatable, a lawyer will not be held responsible for failing to anticipate how the uncertainty will ultimately be resolved." (Emphasis omitted.)); *Wood v. McGrath, North, Mullin & Kratz, P.C.*, 589 N.W.2d 103, 106 (Neb. 1999) ("an attorney's judgment or recommendation on an unsettled point of law is immune from suit, and the attorney has no duty to accurately predict the future course of unsettled law"); *Crosby v. Jones*, 705 So. 2d 1356, 1358 (Fla. 1998) ("The rule of judgmental immunity is premised on the understanding that an attorney, who acts in good faith and makes a diligent inquiry into an area of law, should not be held liable for providing advice or taking action in an unsettled area of law."); *Lucas v. Hamm*, 364 P.2d 685, 689 (Cal. 1961) (an attorney "is not liable for being in error as to a question of law on which reasonable doubt may be entertained by well-informed lawyers"); *Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 668 (D.C. 2009) (the unsettled law exception to attorney malpractice liability "is based on the understanding that an attorney is not expected, much less required, to accurately predict developments in the law"); see also *Davis v. Damrell*, 174 Cal. Rptr. 257, 259 (Cal. Ct. App. 1981) (noting that test for whether judgmental immunity applies "invokes a two-pronged inquiry: (1) whether the state of the law was unsettled at the time the professional advice was rendered; and (2) whether that advice was based upon the exercise of an informed judgment").

judgment after undertaking reasonable research of the relevant legal principals and facts of the given case.' [Citation.] To hold that an attorney may not be held liable for the choice of trial tactics and the conduct of a case based on professional judgment is not to say, that an attorney may not be held liable for any of his actions in relation to a trial. He is still bound to exercise a reasonable degree of skill and care in all of his professional undertakings.' [Citation.]" (Emphasis added.) *Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 666 (D.C. 2009) (quoting *Sun Valley*, 981 P.2d at 240).

See also 7A C.J.S. *Attorney & Client* § 332, at 371 (2004) ("The 'judgmental immunity rule,' rather than granting some type of 'immunity' to attorneys, is nothing more than a recognition that if an attorney's actions could under no circumstances be held to be negligent, then a court may rule as a matter of law that there is no liability, but if there is a genuine issue of material fact about the reasonableness and care exercised by the attorney, then the issue must be submitted to the jury for determination.")

¶ 37    Citing *Biomet*, plaintiff argues that "in order to avoid liability based on a litigation judgment, as claimed here by [defendant] and as found by the trial court, the attorney *must actually have exercised reasoned judgment in his decision making* and *** not every act of an attorney constitutes a professional judgment." (Emphasis in original.) Plaintiff argues that the alleged negligent acts at issue here "are not like those decisions which lawyers must sometimes make which courts characterize as 'errors of judgment' and which form the basis of 'judgmental immunity' from malpractice liability." Instead, plaintiff argues, those errors of judgment "are limited to situations where the lawyer has determined that there are advantages and disadvantages to alternative courses of action, has actually weighed those advantages and disadvantages, and then made a reasoned, professional judgment as to which course is best for the client."

¶ 38    Defendant asserts, however, that "[t]he alleged failure to raise certain defenses or claims is precisely the sort of allegation to which the doctrine of judgmental immunity applies." Defendant also argues that claims alleging mere errors of judgment are properly dismissed pursuant to section 2-615 and cites the case of *Goldstein v. Lustig*, 154 Ill. App. 3d 595 (1987), as controlling. The case involved a dentist, Lance Goldstein, who became involved in a dispute with his employer regarding allegations that he had engaged in fraudulent billing practices. *Id.* at 597. Goldstein retained an attorney, Steven Lustig. Goldstein told Lustig that his employer "had valid grounds to terminate him for misconduct and asked his legal advice as to the best course of conduct." *Id.* Goldstein showed Lustig his employment contract, which contained different provisions for benefits depending upon whether Goldstein were to quit or was terminated for cause. *Id.* Lustig told Goldstein it would not make any difference, and also informed him that if he waited and allowed himself to be terminated, he could sue his employer. *Id.* Goldstein took this latter advice and sued. *Id.* Lustig then advised settlement of the lawsuit. *Id.* Goldstein and his employer subsequently signed a consent decree, a mutual release, and a settlement agreement. *Id.* When Goldstein then sued Lustig for legal malpractice, Lustig filed a motion to dismiss under section 2-615 and, in the alternative, section 2-619. *Id.* The motion was granted, apparently on both grounds. Goldstein appealed both bases and the appellate court addressed each.

¶ 39    The court first analyzed Goldstein's argument that the trial court had erred in ruling that

-11-

his complaint against Lustig failed to state a cause of action for legal malpractice. *Id.* at 598-601. The court quickly concluded that Goldstein could "plead no set of facts that [would] establish the element of cause required for a legal malpractice action, and therefore the complaint was properly dismissed." *Id.* at 599. As the court noted, if the employer had cause to discharge Goldstein, "he would not be able to enforce the contract and recover benefits, regardless of whether he resigned or waited to be terminated." *Id.* Noting that a party who materially breaches a contract cannot then take advantage of the contract, the court additionally opined as follows: "plaintiff's use of the corporate books and records to further an insurance fraud scheme constitutes a material breach of the employment agreement." *Id.* The court also explained that, *if* Goldstein had been discharged without cause, he would have had an action against the employer for wrongful discharge and Lustig's "advice to wait for termination would not have precluded him from recovering his resignation benefits." *Id.* at 600.

¶ 40    *Goldstein* is distinguishable both procedurally and factually. As plaintiff here correctly notes, not only was *Goldstein* decided on a joint section 2-615 and section 2-619 motion but "more importantly, unlike the instant case, was dismissed on the basis of a detailed factual record of matters outside the complaint." As plaintiff additionally notes, *Goldstein* is distinguishable because the court effectively validated the lawyer's judgment when it determined that either course of action by Goldstein would have made no difference: "he would not be able to enforce the contract and recover benefits, regardless of whether he resigned or waited to be terminated." *Id.* at 599.

¶ 41    Thus, regarding defendant's contention that *Goldstein* constitutes established precedent that "a trial court should determine as a matter of law whether the allegations of a complaint amount to only allegations of error in judgment for which no cause for legal malpractice can be stated, even without fact and expert discovery," clearly *Goldstein* was limited to its facts. In view of the court's determination that Goldstein failed to state a cause of action for legal malpractice because he failed to allege proximate cause, the court's further discussion of whether Lustig's conduct was an error of judgment rather than negligence is *dicta*. As plaintiff observes, "the *principal* basis for the decision in *Goldstein* was plaintiff's failure to establish proximate cause, not the claim that the lawyer committed an 'error of judgment,' and the Court's observations about lawyer judgment cannot be divorced from the proximate cause issue." (Emphasis added.) We agree and note that the *Goldstein* court made the additional determination that Lustig:

"had to exercise his judgment based on an evaluation of what plaintiff had told him about the employment dispute, the terms of the contract, the applicable law and any alternative remedies plaintiff might have. He also had to take into consideration that resignation would bind plaintiff to a restrictive covenant which would not be the case if he was wrongfully terminated." *Id.* at 600-01.

¶ 42    The court also was clearly disturbed by the fact that Goldstein had engaged in fraud and felt compelled to point this out in its section 2-619 analysis:

"The courts of Illinois have a long-established rule that they will not aid a fraudfeasor who invokes the court's jurisdiction to relieve him of the consequences of his fraud.

-12-

[Citation.] Since the basis of plaintiff's action in the present case is an attempt to reduce the economic consequences of his fraudulent conduct by recovering from his attorney, we hold that the trial court did not err in dismissing his complaint with prejudice." *Id.* at 603.

*Goldstein* is inapposite for all of these reasons and is not the seminal case that defendant portrays it to be.

¶ 43 In support of his argument that defendant's failure to raise meritorious defenses was negligent and not a mere "error of judgment," plaintiff relies on *Gelsomino v. Gorov*, 149 Ill. App. 3d 809 (1986). In *Gelsomino*, the plaintiffs had previously tried to collect on an insurance policy but lost after a jury trial where the insurance company contended that the insureds had committed arson. The insureds then sued their former attorneys for malpractice, alleging they breached their duty by failing to call six witnesses who could have testified favorably for the insureds. Specifically, the plaintiffs contended that the defendants failed "to interview, prepare and present the testimony of certain witnesses" that would have explained discrepancies in the sales tax figures and controverted the circumstantial evidence of arson. *Id.* at 811. The defendants filed a motion for summary judgment arguing that the errors and omissions alleged in the complaint were errors of judgment rather than errors of negligence. *Id.* In response, the plaintiffs submitted the affidavits of two legal malpractice experts who opined that the defendants' conduct in failing to investigate and present the witnesses fell below the appropriate standard of conduct. *Gelsomino*, 149 Ill. App. 3d at 814. Nonetheless, the trial court granted summary judgment in the attorneys' favor, holding that the failures "were matters of professional judgment rather than errors of negligence." *Gelsomino*, 149 Ill. App. 3d at 813. This court reversed.

¶ 44 Noting that the defendants had neither offered evidence to discredit plaintiff's experts nor provided any reason why the court should not accept the experts' opinions on this question, the court determined that the affidavits were sufficient to demonstrate the existence of a question of fact as to breach of duty. *Gelsomino*, 149 Ill. App. 3d at 814. As the court explained: "An attorney's judgment in the preparation and handling of a case is not *** always and automatically protected under the rubrics of 'matters of professional judgment' or 'tactical decisions.' " *Id.* "[M]erely characterizing an act or omission as a matter of judgment does not end the inquiry." *Id.* The issue remains as to whether the attorney has exercised a reasonable degree of care or skill in representing his client. *Id.* This issue is a question of fact. *Id.* Noting that it was expressing no opinion as to whether the defendant breached a duty owed to the plaintiffs, the court concluded that "summary judgment was inappropriate on this issue because it [could not] be said as a matter of law that the movant was entitled to judgment." *Gelsomino*, 149 Ill. App. 3d at 814.

¶ 45 Plaintiff now contends that the instant case is "virtually identical" to *Gelosomino* because the "the sole issue is whether the trial court could properly decide, as a matter of law and without a trial, whether the failures alleged against the lawyer defendants constituted actionable negligence or 'mere errors of judgment.' " Plaintiff asserts that his third amended complaint is "substantiated" by his legal malpractice expert's uncontradicted affidavit stating that there was no "professional judgment" to be exercised by defendant in deciding whether to assert the meritorious defenses alleged in the complaint. Plaintiff argues, therefore, that

a question of fact was created as to whether defendant's conduct was negligent and could not be decided as a matter of law.

¶ 46 Defendant attempts to distinguish *Gelsomino* by noting that its holding related to "circumstances *at the summary judgment stage*." (Emphasis in original.) While it is true that the attorney defendants in *Gelsomino* sought summary judgment, they apparently had not contested the legal sufficiency of the complaint's allegations that they were "negligent in the investigation, preparation and presentation of the plaintiff's lawsuit." *Id.* at 810. Moreover, this court has noted that "a motion for summary judgment almost necessarily assumes the sufficiency of the allegations of the complaint." *Hallmark Insurance Co. v. Chicago Transit Authority*, 179 Ill. App. 3d 260, 267 (1989); see also *Janes v. First Federal Savings & Loan Ass'n of Berwyn*, 57 Ill. 2d 398, 406 (1974) ("When, and only when, a legally sufficient cause of action had been stated should the court have entertained the motions for summary judgment and considered the affidavits filed in support thereof."). Thus, defendant has pointed to a distinction without a difference. Nonetheless, we do not think the analysis in *Gelsomino* resolves the issue before this court as to whether the trial court *in the instant case* properly dismissed plaintiff's third amended complaint on the basis that defendant's actions constituted nonactionable errors of judgment, and not professional negligence, as a matter of law.

¶ 47 The parties disagree as to whether plaintiff's expert's affidavit may be considered. Our supreme court addressed the use of exhibits attached to a complaint in *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414 (2004). There, as here, there was no issue regarding any inconsistencies between the exhibit and the complaint. The *Bajwa* court noted generally that a party may attach a written document to the complaint which will be treated as part of the pleading if the pleading specifically incorporates the exhibit by reference. *Id.* at 432. In ruling on a section 2-615 motion, the court may consider documents and exhibits that have been incorporated into the pleadings. *Taylor v. Frey*, 406 Ill. App. 3d 1112, 1115 (2011). All facts apparent from the face of the pleadings, including the attached exhibits, must be considered. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009).

¶ 48 Defendant here now argues that plaintiff's "use of an affidavit to bolster his Third Amended Complaint has no bearing on this Court's determination of the sufficiency of the pleading." Defendant relies on *Brock v. Anderson Road Ass'n*, 287 Ill. App. 3d 16 (1997). In *Brock*, the experts' affidavits attached to the complaint stated that the defendant emergency medical technicians' conduct "reflected 'utter indifference and disregard for the safety of Mr. Brock.' " *Id.* at 25. The court, noting that the issue was whether plaintiff had *sufficiently pleaded* that defendant's conduct was willful and wanton, held that the experts' affidavits were mere "conclusions." *Id.* Plaintiff now contends that *Brock* is distinguishable because his expert's affidavit, in addition to legal conclusions, sets forth the underlying factual basis for the opinion, *i.e.*, they are based on the allegations of plaintiff's complaint. Although plaintiff contends that we may therefore consider the affidavit, we actually believe it renders the affidavit merely duplicative of any well-pleaded allegations in the third amended complaint. The issue here, as in *Brock*, is whether plaintiff has *sufficiently pleaded* his cause of action regarding defendant's conduct.

¶ 49 In *The Retreat v. Bell*, 296 Ill. App. 3d 450 (1998), the court discussed the proper

consideration of an affidavit submitted by the plaintiff in opposition to a section 2-615 motion to dismiss. As the court observed: "A motion for summary judgment is a better way to determine whether there are facts to support a complaint than is a motion to dismiss." *Id.* at 453. However, the court remarked: "It appears that the sole reason [defendant] wanted this case decided on a motion to dismiss, and not on a motion for summary judgment, was to take advantage of the rule that affidavits may not be considered in deciding section 2-615 motions." *Id.* at 453-54.

¶ 50    As the *Retreat v. Bell* court further stated:

"There are no cases *** that ignore affidavits and discovery materials submitted by the *plaintiff*, in opposition to the section 2-615 motion, and in response to defendant's arguments that plaintiff is pleading only a conclusion and that plaintiff cannot plead specific facts in support of that conclusion. The circuit court should dismiss a cause of action on the pleadings only if it is clearly apparent that no set of facts can be proven which will entitle a plaintiff to recovery. [Citation.] How can it be said that no set of facts can be proved that will entitle a plaintiff to recovery when the record contains affidavits setting out those facts? *** Why should we ignore the affidavits and limit our view solely to the supposedly conclusory pleading, when the affidavits support, instead of contradict, that pleading? Pleading motions should not be decided on technicalities, but with a view to doing substantial justice between the parties. [Citation.]" (Emphasis in original and internal quotation marks omitted.) *Id.* at 454.

¶ 51    In the instant case, plaintiff's legal expert opined that defendant's failures to assert plaintiff's available defenses in the underlying case constituted professional negligence, and that it was more probably true than not that had these arguments been asserted, plaintiff would have prevailed and would not have been ordered to sell his shares to Curia pursuant to the 1989 agreement. Defendant contends that the affidavit contained mere legal conclusions that cannot be considered; plaintiff contends the affidavit sets forth the underlying factual matter on which the opinion is based. We need not resolve this issue and need not consider the affidavit at this stage of the pleadings. Although plaintiff attached the affidavit in support of his argument that defendant's actions were not mere errors of judgment, we believe that plaintiff's third amended complaint, standing alone, contained sufficient allegations to state a cause of action for attorney malpractice.

¶ 52    Plaintiff's third amended complaint contained three counts alleging in detail his claims of negligence on the part of defendant for failing to: assert meritorious and complete defenses to Curia's attempted exercise of the 1989 options (count I); argue that the writings were ambiguous (count II); and enforce the July 2004 agreement (count III). Plaintiff is not merely alleging that defendant was negligent because it lost the argument in the district court. Also, plaintiff's allegations go beyond mere errors of judgment by defendant. Plaintiff has alleged sufficient facts, which we must take as true at this point, tending to show that defendant's conduct in the underlying lawsuit fell below the standard of care and that this negligence was the proximate cause of plaintiff's damages. Therefore, plaintiff's third amended complaint should not have been dismissed under section 2-615.

¶ 53    We recognize that it *may* be true that defendant considered the other legal theories that

plaintiff now contends it should have advanced but nonetheless made a reasoned judgment and tactical decision to proceed as it did. That is, defendant *may* have decided that the best course of action was to argue that the 1989 agreement's options were abrogated by the 1993 modification agreement instead of advancing the other legal theories. As defendant notes, plaintiff has conceded that this was a plausible legal theory, and the Seventh Circuit explicitly found that this argument was a reasonable one (and as reasonable as the one advanced by Curia). Alternatively, defendant may have not pursued these other arguments that plaintiff now alleges defendant negligently failed to assert simply because defendant was unaware of their existence in the first instance. Defendant's argument that its conduct involved, at most, a mere error of judgment presupposes that an actual "decision" was made on its part, which is not reflected in the record at this stage.

¶ 54    We find instructive the case of *Howard v. Druckemiller*, 238 Ill. App. 3d 937 (1992). There, the plaintiff sued the attorney who had represented him in a real estate purchase. Similar to the instant case, the defendant had argued that the plaintiff had alleged no more than her error of opinion or judgment. *Id.* at 939. The trial court in *Howard* granted the defendant's motion to dismiss under section 2-615 of the Code of Civil Procedure for failure to state a cause of action for legal malpractice. *Id.* However, this court reversed. We concluded that the pleading "adequately alleged an attorney malpractice claim that should not have been dismissed for legal insufficiency." *Id.* at 943. We noted that the plaintiff had clearly alleged breach of the attorney's duty by stating that he had told the defendant that he wished to hire a private home inspector but the defendant informed him that such an inspection was not necessary because the Veterans Administration inspection would suffice. *Id.* at 942. We also concluded that the plaintiff had adequately alleged injury or loss proximately resulting from the defendant's advice, referring to the cost of repairing the latent defects he first discovered after moving into the house. *Id.*

¶ 55    As we explained: "[t]he plaintiff's first amended complaint included well-pleaded facts that, when construed in his favor, could support a conclusion that the defendant's advice not to hire a private inspector was a breach of the standard of care owed him. Expert opinion on the standard of care for a real estate lawyer in the defendant's position *could* establish that the advice was such a breach." (Emphasis added.) *Id.* at 943. Therefore, "[t]he plaintiff was entitled to present evidence both on the standard of care due him and on whether the defendant's advice violated that standard." *Id.* Similarly, in the instant case, construing the well-pleaded facts in the third amended complaint in plaintiff's favor could support a conclusion that defendant breached its duty to plaintiff.

¶ 56    In sum, in the instant case, we have no way of knowing, at this stage of the proceedings, why defendant proceeded as it did–with the argument that it lost in the district court. Despite defendant's numerous references to its "decision" and its "reasoned judgment" to forego certain legal theories and arguments, we agree with plaintiff that the record is devoid of any evidence that defendant made *any* strategic decision or informed judgment not to assert the defenses that plaintiff now contends were meritorious and should have been asserted. We also cannot determine if defendant actually "decided" not to assert plaintiff's other, allegedly meritorious, defenses, as opposed to defendant simply being unaware of, or overlooking, the existence of any other legal argument. We accept as true all well-pleaded facts in plaintiff's

-16-

third amended complaint and the reasonable inferences that can be drawn from those facts. In doing so, we cannot say that it clearly appears that no set of facts could be proved which would entitle plaintiff to recover. Thus, although the trial court here erred in dismissing plaintiff's third amended complaint, certainly dismissal could be appropriate as a matter of law where "it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief." (Internal quotation marks omitted.) *Estate of Powell v. John C. Wunsch, P.C.*, 2013 IL App (1st) 121854, ¶ 15. Such was the case in *Goldstein v. Lustig*, 154 Ill. App. 3d 595 (1987), discussed earlier. Here we cannot say as a matter of law that defendant's conduct constituted a mere error of judgment for which it is immune from liability.

¶ 57 Nevertheless, defendant notes that this court may "affirm on any basis supported by the record, regardless of whether the trial court based its decision on the proper ground." (Internal quotation marks omitted.) *Sherman v. Township High School District 214*, 404 Ill. App. 3d 1101, 1109 (2010). Defendant asserts that the record establishes four alternative bases for dismissal of the third amended complaint with prejudice that support affirmance of the trial court's dismissal order.

¶ 58 Defendant first argues that plaintiff is judicially estopped from arguing the existence of the 2004 oral agreement as a result of an affidavit he executed in the underlying action. In his affidavit in the underlying action, plaintiff stated:

> "In July 2004, after a serious illness, I met with Curia and offered to sell my shares in the Corporations to Curia and retire from the business.
>
> In September 2004, I presented an offer to Curia, but Curia did not accept. However, Curia and I continued negotiating Curia's buy-out of my shares.
>
> On December 4, 2004, I presented another offer to Curia. Curia did not accept the offer but continued to discuss the sale and purchase with me.
>
> Curia even procured bank financing allowing him to purchase my shares. However, Curia never accepted any of my offers.
>
> Because Curia would not move forward in the negotiations to purchase my interests in the Corporation, I consulted an outside broker for the purpose of considering the sale of the Corporations to an outside buyer."

Therefore, defendant contends that plaintiff cannot argue that defendant was negligent in failing to raise the existence of the purported 2004 oral agreement.

¶ 59 We have noted:

> "The doctrine of judicial estoppel promote[s] the truth and *** protect[s] the integrity of the court system by preventing litigants from deliberately shifting positions to suit the exigencies of the moment. [Citation.] Judicial estoppel is flexible but five elements are generally necessary: (1) the two positions must be taken by the same party; (2) the positions must be taken in judicial proceedings; (3) the positions must be given under oath; (4) the party must have successfully maintained the first position and received some benefit; and (5) the two positions must be totally inconsistent. [Citation.] Judicial estoppel applies to statements of fact and not to legal opinions or conclusions. [Citation.]" (Internal quotation marks omitted.) *United Automobile Insurance Co. v.*

-17-

*Buckley*, 2011 IL App (1st) 103666, ¶ 35.

"Before a statement can be held to be a binding judicial admission, it must be given a meaning consistent with the context in which it was found [citation], and it must be considered in relation to the other testimony and evidence presented. [Citation.]" *Smith v. Pavlovich*, 394 Ill. App. 3d 458, 468-69 (2009). "Admissions are not binding if the amended pleading asserts that the allegations in the original pleading were the product of mistake or inadvertence. [Citation.]" *Heider v. Leewards Creative Crafts, Inc.*, 245 Ill. App. 3d 258, 271 (1993).

¶ 60    Plaintiff argues that defendant drafted the affidavit for him and the legal conclusion in the affidavit that Curia had not "accepted" the offer was defendant's conclusion and not plaintiff's. He also contends that defendant advised him that "under Illinois law, Curia's mere oral agreement, although explicit, did not constitute a legally effective 'acceptance.' " Thus, he contends that his prior affidavit is not legally binding.

¶ 61    A somewhat similar argument was rejected in *Beverly Bank v. Coleman Air Transport*, 134 Ill. App. 3d 699, 704 (1985), in which an action was brought by a bank against defendant, the maker and guarantor of promissory notes. Defendant sought to disavow an earlier admission of liability in his original verified answer, claiming "his attorney did not consult with him or allow him to review the answer and that the answer was the product of mistake or inadvertence." *Id.* The court decided that "[t]hese unsupported and largely conclusionary statements [were] insufficient to show mistake or inadvertence." *Id.* The court noted that "[t]here [was] nothing in the record [indicating the] attorney did not have knowledge of the statements in the answer or that he did not have authority to file a verified answer in behalf of his client." *Id.* The instant case, however, is different because plaintiff is suing his attorney and alleging that the attorney drafted these statements for him. Moreover, plaintiff has noted that defendant asserted the opposite when it filed an amended complaint in his district court action against Curia alleging, as plaintiff now alleges here, that in 2004, plaintiff and Curia entered into an agreement for Curia to purchase plaintiff's shares for $4.2 million and that Curia later "reneged" on that agreement. Plaintiff also notes that defendant filed this amended complaint on February 15, 2008 but it was too late to obtain relief for him. Thus, we do not believe the judicial estoppel doctrine can be invoked by the attorney defendant under the particular circumstances of this case.

¶ 62    Defendant next argues that, even if we do not apply judicial estoppel, any claim based on the purported 2004 agreement should have been dismissed because plaintiff "failed to plead facts establishing the elements of an enforceable agreement." Specifically, defendant contends that plaintiff did not sufficiently plead the existence of a July 2004 oral agreement because he failed to plead the contract's specific terms and also failed to plead that the conditions precedent had been met.

¶ 63    In support of its argument, defendant cites *Claire Associates v. Pontikes*, 151 Ill. App. 3d 116 (1986). As the *Pontikes* court explained:

"Legal-malpractice complaints are by their nature lawsuits dependent upon predicate lawsuits. *** [A] legal malpractice claim is a 'case within a case.' This is because of the damages element of the action; no malpractice exists unless counsel's negligence has

resulted in the loss of an underlying cause of action, or the loss of a meritorious defense if the attorney was defending in the underlying suit." *Id.* at 122.

As the court further explained: "[I]t is not enough merely to inform the defendant of the nature of the claim; the pleading must also provide the factual premise underlying the claim." *Id.* at 123.

¶ 64    We believe *Pontikes* is distinguishable. There, plaintiffs failed to plead the nature of their claim with factual specificity and had not alleged any facts which would overcome a clearly delineated deficiency in the underlying breach of contract action against a lender for its refusal to keep its loan commitment. Specifically, the *Pontikes* court noted that the lender's financing commitment was granted only on the condition that the financial vitality of the borrowing entity, *i.e.*, the original partnership, remain unchanged, yet it *had* changed from having two general partners who could be held jointly and severally liable in the event of deficiency upon default, to a successor partnership, which had only one general partner. *Id.* at 124. As a result, the lender was entitled to deny the loan to the successor partnership, and the lender *had* raised this in its motion to dismiss the contract action. *Id.* Therefore, it was irrelevant that defendant attorneys failed to respond to the motion. *Id.*

¶ 65    In the instant case, in his opening brief, plaintiff argued that he adequately alleged the existence of an enforceable agreement. "[C]ontract formation requires only the existence of an offer, an acceptance, and consideration." *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 979 (1997); see also *Talbert v. Home Savings of America, F.A.*, 265 Ill. App. 3d 376, 380 (1994) ("To allege the existence of a valid contract, a plaintiff must plead facts indicating there was an offer, an acceptance, and consideration."). " 'For an oral contract to be valid and enforceable, its terms must be definite and consistent.' [Citation.]" *Downs v. Rosenthal Collins Group, L.L.C.*, 2011 IL App (1st) 090970, ¶ 49. We agree with plaintiff that he has adequately alleged the elements of the 2004 oral contract. He alleged that the parties to the agreement were Curia and himself, that he offered to sell Curia all of his remaining stock for a total purchase price of $4.2 million, and Curia orally agreed. Although we express no opinion on the merits of the argument, there is nothing in the record at this point, as there was in *Pontikes*, that would negate the validity of the underlying contract. Moreover, as plaintiff has noted, defendant itself drafted a second amended complaint conceding its belief that a valid contract existed.

¶ 66    Defendant next argues that plaintiff has failed to state a cause of action against it because it did not proximately cause plaintiff's damages. Defendant notes that plaintiff asserts that defendant's negligence caused him to lose the right to pursue a viable cause of action, namely, the enforceability of the alleged 2004 contract. However, citing *Mitchell v. Schain, Fursel & Burney, Ltd.*, 332 Ill. App. 3d 618, 621-22 (2002), defendant argues that the statute of limitations had not expired at the time he discharged defendant and, therefore, plaintiff's new counsel could have pursued plaintiff's claim for breach of the putative July 2004 oral agreement. Defendant argues that plaintiff had several avenues by which he could have asserted his claim: (1) bring a new action for breach of contract; (2) amend his complaint after the Seventh Circuit's ruling; or (3) abandon the appeal and move to amend his complaint in the district court.

¶ 67    Similarly, with respect to plaintiff's allegations that defendant was negligent in failing to argue that the contract and subsequent writings were ambiguous, defendant asserts alleged failure was not the proximate cause of plaintiff's damages where the successor attorney could have raised the argument and, in any event, the Seventh Circuit's decision "resuscitated" that argument. Defendant contends that plaintiff "did not seize that opportunity." Defendant contends that plaintiff had the right to "unwind the court-ordered sale" and could have averted any harm had plaintiff been willing to refund the consideration he received for the sale.

¶ 68    Plaintiff responds, in part, that it was too late to enforce the 2004 agreement. Plaintiff notes that the district court had entered summary judgment on February 6, 2006, two years before his new counsel was retained. Citing *Figgie International, Inc. v. Miller*, 966 F.2d 1178 (7th Cir. 1992), plaintiff argues that, "[s]ince the 2004 agreement could have and should have been asserted at the outset of the district court litigation in 2005, the law is clear that [his] new counsel would not have been permitted to file yet another amended complaint in 2008, two years after [plaintiff] lost summary judgment."

¶ 69    As the court in *Figgie* stated: "Leave to amend may be denied where there has been undue delay, bad faith, prejudice to the opponent, dilatory motive on part of movant, or amendment would be futile." *Figgie International, Inc.*, 966 F.2d at 1180-81. Defendant has not cited any authority that would have permitted plaintiff to amend his complaint at such a late date. Plaintiff also notes that the other cases cited by defendant are distinguishable because there was no uncertainty as to whether plaintiff's successor counsel would have been permitted to pursue the claim lost by the initial counsel's negligence. By contrast, plaintiff notes he "did not have an 'absolute right,' or any 'right' to amend his complaint more than two years after losing on summary judgment." We agree with plaintiff that whether his new counsel would have been permitted to amend the complaint in 2008 is a question of fact that cannot be decided on a section 2-615 motion to dismiss.

¶ 70    The last basis for affirmance raised by defendant is that plaintiff's proving his "case within a case" is speculative. The parties agree that, *only* after finding ambiguity, would the court have considered extrinsic evidence. Plaintiff has essentially argued that, *had* defendant argued ambiguity: (1) the district court would have found an ambiguity; (2) plaintiff would have then had the opportunity to present extrinsic evidence; and (3) plaintiff would have prevailed. Defendant counters that "the bare bones of [plaintiff's] argument is that [defendant's] persuasive prowess alone would have convinced Judge Reinhard that the contract was ambiguous, resulting in the eventual admission of extrinsic evidence." Defendant also argues that plaintiff has failed to plead any facts that the Judge Reinhard *would have* ruled differently had defendant argued ambiguity in the trial court. Defendant argues that any such claim is "far too speculative to form the basis of a malpractice action."

¶ 71    This court has acknowledged that "every legal malpractice case requiring proof of the 'case within the case' deals in some degree of speculation as to what the damages in the underlying claim would have been absent the attorney misconduct." *Glass v. Pitler*, 276 Ill. App. 3d 344, 354 (1995). In *Glass v. Pitler*, we concluded that "the speculation required [there was] overwhelming." *Id.* We upheld summary judgment for the attorney who gave advice regarding whether pension funds would have protection in bankruptcy. We decided

that the clients could not prove attorney malpractice as a matter of law because they could not establish with any reasonable degree of certainty how the underlying court would have ruled had they filed a bankruptcy petition under the unique facts of that case. Notably, the state of the law, on which the attorney had provided the allegedly erroneous advice, was completely unsettled at the time. *Id.* at 352-53. Thus, the court would have been called upon to "predict how a bankruptcy court judge would have viewed the law in light of existing conflicting and nonbinding case law." *Id.* at 354. The instant case is different. As plaintiff notes, Illinois law regarding the exercise of options and the construction of contracts is not in a state of flux or subject to conflicting court opinions.

¶ 72     In *Georgou v. Fritzshall*, No. 93 C 997, 1995 WL 248002 (N.D. Ill. Apr. 26, 1995), decided under Illinois law, the court stated:

"[A] malpractice plaintiff is not required to demonstrate what award the *original judge* or jury would have made if no malpractice had occurred. Once a malpractice plaintiff has demonstrated that his attorney fell below a reasonable standard of professional conduct, the factfinder must determine what a *reasonable judge* or jury would have concluded and compare that conclusion to the actual resolution of the underlying action to determine damages." (Emphasis added.) *Id.* at *5.

This objective standard has been applied in other jurisdictions. For example, in *Mattco Forge, Inc. v. Arthur Young & Co.*, 60 Cal. Rptr. 2d 780 (Cal. Ct. App. 1997), the court stated:

"The trial-within-a-trial method does not 'recreate what a particular judge or fact finder would have done. Rather, the jury's task is to determine what a reasonable judge or fact finder would have done....' [Citation.] Even though 'should' and 'would' are used interchangeably by the courts, the standard remains an objective one. The trier of facts determines what should have been, not what the result would have been, or could have been, or might have been, had the matter been before a particular judge or jury." (Emphasis omitted.) *Id.* at 793.

See also *Hickey v. Scott*, 796 F. Supp. 2d 1, 4 (D.D.C. 2011) (appropriate standard for the fact finder to apply in determining causation in a legal malpractice action is the objective, reasonable person standard, meaning that the fact finder need not attempt to discern what a *particular* judge would have decided based on the facts before him but only what a *reasonable* judge would have decided); *McKnight v. Gingras*, 966 F. Supp. 801, 812 (E.D. Wis. 1997) (in legal malpractice action premised on claim that attorney's negligence resulted in reversal on appeal of a judgment for client, proper focus is not what the appellate court that actually heard case would have decided but, rather, what a reasonable, fully briefed judge or panel of judges would have decided if attorney had proceeded differently); *Collins v. Miller & Miller, Ltd.*, 943 P.2d 747, 756 (Ariz. Ct. App. 1996) (in establishing causation in a legal malpractice action, the plaintiff must convince the trier of fact that, but for attorney's negligence, a *reasonable* judge or jury would have decided in his or her favor in underlying action).

¶ 73     Contrary to defendant's contention, plaintiff is not "required to plead and prove what *Judge Philip G. Reinhard* would have done had a different argument *** been made."

(Emphasis added). The test is objective and the question is what a reasonable judge would have done. See Restatement (Third) of Law Governing Lawyers § 53 cmt. b, at 390 (2000) ("The judges or jurors who heard or would have heard the original trial or appeal may not be called as witnesses to testify as to how they would have ruled. That would constitute an inappropriate burden on the judiciary and jurors and an unwise personalization of the issue of *how a reasonable judge or jury would have ruled*." (Emphasis added.)) Thus for the reasons stated, plaintiff's proving his case-within-a-case is not speculative.

¶ 74                                                        CONCLUSION

¶ 75        In view of the foregoing, we conclude that the trial court erred in dismissing plaintiff's third amended complaint pursuant to section 2-615. We cannot say that, as a matter of law, plaintiff can prove no set of facts from which a jury could find that defendant's negligence in failing to raise the additional available arguments, as alleged in the third amended complaint, was the proximate cause of plaintiff's damages. Plaintiff's complaint stated a cause of action for legal malpractice. We therefore reverse and remand.

¶ 76        Reversed and remanded.