2026 IL App (1st) 240056-U

No. 1-24-0056

Order filed May 12, 2026

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| RICKY STEWART, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 L 7170 |
| | ) | |
| BRILL & FISHEL, P.C., and FRANCINE FISHEL, | ) | Honorable |
| | ) | Catherine A. Schneider, |
| Defendants-Appellees. | ) | Judge, presiding. |

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We reverse the circuit court's grant of summary judgment in defendants' favor on plaintiff's legal malpractice claim and remand the matter to the circuit court for further proceedings.

¶ 2    Plaintiff Ricky Stewart appeals from the circuit court's grant of summary judgment in favor of his former attorney, Francine Fishel, and her law firm, Brill & Fishel, P.C. (collectively, defendants). Fishel represented plaintiff in a Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 2016)) claim arising out of fall injuries plaintiff suffered while working in a

grocery warehouse on June 13, 2017. On appeal, plaintiff contends that summary judgment was improper because there are disputes of fact and differing inferences a reasonable factfinder could draw from undisputed facts about whether Fishel's negligence caused him to lose his workers' compensation case following an arbitration hearing. Plaintiff also argues that the circuit court misunderstood the record regarding whether Fishel had a duty to appeal the arbitrator's denial of workers' compensation benefits to the Workers' Compensation Commission (the Commission). For the following reasons, we reverse and remand.[1]

¶ 3                                  I. BACKGROUND

¶ 4      Plaintiff's second amended complaint alleged that he was working at Jewel Food Stores/New Albertson's, Inc. (Jewel) on June 13, 2017, when he fell and suffered a herniated disc in his cervical spine, which required surgery. Plaintiff retained defendants to represent him in a workers' compensation claim against Jewel. Fishel filed plaintiff's workers' compensation claim and represented him at an arbitration hearing. The arbitrator found that plaintiff did not carry his burden of proof and awarded him no workers' compensation benefits. Plaintiff pled one count of legal malpractice premised on mistakes Fishel allegedly made in handling his workers' compensation claim. Relevant here, plaintiff alleged that Fishel did not (1) know of, obtain, or introduce the favorable opinions of an independent medical examiner (IME); (2) develop or present evidence or legal arguments that plaintiff's injuries arose out of his employment; (3) know of, obtain, or prepare plaintiff with a video recording of his fall; (4) obtain or introduce plaintiff's emergency room medical records; or (5) appeal the arbitrator's decision to the Commission despite

---

[1]The parties completed briefing of this appeal in December 2024. However, the original authoring justice's illness delayed the resolution of this appeal. To accelerate resolution of this matter, the court recently reassigned the case to this panel.

promising plaintiff she would do so. Plaintiff alleged that, due to Fishel's negligence, he lost workers' compensation benefits in excess of $433,000.

¶ 5    Following discovery, defendants moved for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2022)).

¶ 6                                A. Facts of Record

¶ 7    We take the following facts from the exhibits attached to the parties' summary judgment filings. The summary judgment record consists of more than 40 exhibits spanning approximately 2,000 pages, including the record of the underlying workers' compensation case, as well as written, oral, medical, and expert discovery in this lawsuit. This extensive record illustrates how fact-intensive this case is and why it was not a good candidate for resolution at summary judgment.

¶ 8                           1. Plaintiff's Injury and Treatment

¶ 9    Plaintiff began working at Jewel as a janitor in 2015. In January 2017, plaintiff transferred to the "recoup room," where he separated damaged products Jewel would sell from products Jewel would discard or donate. The damaged products arrived in "totes," which are plastic storage bins approximately three feet long, two feet wide, and two feet tall. Plaintiff removed damaged products from full totes and sorted them into empty totes or cardboard boxes depending on their destination. Totes sat on pallets, which are wooden platforms approximately 40 inches long, 48 inches wide, and 4 to 7 inches tall. Plaintiff sat in a rolling chair while he was sorting products and assembling cardboard boxes, and he stood to carry objects around his work area. At his deposition in this case, plaintiff testified that he stood up from and sat down in his chair 200 to 300 times per shift.

¶ 10    At 11:00 p.m. on June 13, 2017, plaintiff was working in the recoup room when he fell and landed on his backside. Plaintiff immediately felt sharp pain in his neck and back but continued

working through his shift. His pain worsened and, in the early morning hours of June 14, 2017, plaintiff reported the incident to his supervisor, Tom Amburn.

¶ 11    There is no dispute that plaintiff fell while working, but his descriptions of why he fell have varied. Plaintiff has claimed that he fell because (1) he missed his chair while attempting to sit down, (2) he tripped on a tote, (3) he missed his chair *because* he tripped on a tote, and (4) he was uncertain which scenario occurred. For example, according to a June 14, 2017, incident report that Amburn prepared, plaintiff said he was injured "after falling off a chair" because he "was trying to sit on a chair." The same day, plaintiff went to Gottlieb Memorial Hospital's emergency room. According to emergency room medical records, plaintiff said he fell when he "was attempting to sit down and slipped and landed on his buttocks." Also on June 14, 2017, plaintiff sought treatment at Concentra Occupational Health (Concentra), where he stated "that he was tripped and fell backwards." On June 29, 2017, plaintiff told a Concentra treater that "he either tripped over a heavy box or missed the rolling chair he was sitting in when he went to sit down." On June 30, 2017, plaintiff told Department of Veterans Affairs (VA) hospital staff that "[h]is fall at work was after missing a rolling chair." On August 11, 2017, plaintiff told Dr. Sean Salehi at Concentra that he was injured "when he went to go sit in a rolling chair. He [was] unsure exactly what happened if the chair slipped out from under him or if he tripped over one of the nearby bench[es]."

¶ 12    For purposes of summary judgment, the parties do not dispute the medical treatment plaintiff received. In brief, plaintiff's treaters initially prescribed physical therapy, medication, and steroid injections to address pain in his neck, back, and left arm and hand. However, plaintiff's pain worsened and he had difficulty moving. Magnetic resonance imaging (MRI) revealed a

herniated disc in plaintiff's cervical spine. Plaintiff underwent disc fusion surgery on September 22, 2017, and engaged in physical therapy thereafter.

¶ 13                                    2. Plaintiff Retains Defendants

¶ 14    In August 2017, plaintiff retained defendants to represent him in a workers' compensation claim against Jewel. Fishel filed that claim on August 18, 2017.

¶ 15    On January 10, 2018, plaintiff sent Fishel an e-mail that described his fall as follows (without corrections to typographical or grammatical errors):

> "As I was walking back to my chair and turn and squat to sit down, I trip over a Totes and fell directly to the concrete floor on my tailbone. I immediately felt severed sharp pain at back of my neck and at the base of my shoulder. I laid on floor for minutes till I was able to raise up. As I was raising up I pull the Totes from underneath my leg the one I trip over. *** I reported to [my supervisor] at this time I trip on Totes while walking back to my chair and my back is in severed pain."

The parties agree that plaintiff consistently related this description of his fall to Fishel.

¶ 16                                              3. IME

¶ 17    After plaintiff filed his workers' compensation claim, Jewel arranged and paid for an IME pursuant to section 12 of the Act (820 ILCS 305/12 (West 2018)). Board-certified orthopedic surgeon Dr. Stanford Tack conducted the IME on April 11, 2018.

¶ 18    Dr. Tack conducted a clinical examination of plaintiff and reviewed his prior medical records and MRIs. The IME report stated that Dr. Tack received but was unable to view a video recording of plaintiff's fall. However, Dr. Tack viewed the video later, and he has submitted an affidavit attesting that the video does not change any of his opinions in the IME report. At his

deposition in this case, Dr. Tack viewed the video of plaintiff's fall and confirmed that it did not change any of his opinions.

¶ 19    In his IME report, Dr. Tack opined that plaintiff's June 13, 2017, fall caused "a herniated cervical disc at the C6-C7 level."[2] He based this diagnosis on MRIs showing "a large disc herniation *** at C6-C7 which represented a new finding." Dr. Tack characterized the herniated disc as a "new finding" because a pre-incident MRI on May 26, 2017, documented degenerative arthritic disease at the C5-C6 levels but did not show disc herniation at the C6-C7 levels. That disc hernia appeared only after plaintiff's fall on June 13, 2017. In addition, Dr. Tack opined that plaintiff's fall caused "minor exacerbation of preexisting lumbar spondylosis" in his lower back. Lumbar spondylosis is "arthritic change or degenerative disease of the lumbar spine."

¶ 20    At her deposition, Fishel confirmed that she knew plaintiff underwent an IME. Fishel requested the IME report from Jewel's counsel, but they refused to produce it. Fishel did not request or subpoena the IME report from Dr. Tack, nor did she take his deposition. Therefore, Fishel never obtained the IME report and never learned what Dr. Tack's opinions were. Fishel testified that she did not subpoena the IME report from Dr. Tack because doctors "don't typically respond to [her] subpoenas because there's no discovery in" workers' compensation cases. She did not consider deposing Dr. Tack and would not have deposed him even if she had known the IME report was favorable to plaintiff.

---

[2]The cervical spine consists of the first seven vertebrae bones in the spine, *i.e.*, the neck. C6 and C7 are the lowest two discs in the cervical spine, located at the bottom of the neck. *Cervical Spine* (Jan. 18, 2022), https://my.clevelandclinic.org/health/articles/22278-cervical-spine (last visited April 28, 2026).

¶ 21    In his affidavit, Dr. Tack attests that if Fishel had requested his IME report, deposition, or testimony at the arbitration hearing, he would have provided them, and his testimony would have been consistent with his IME report.

¶ 22                                4. Arbitration Hearing

¶ 23    Plaintiff's workers' compensation claim proceeded to an arbitration hearing on July 9, 2018. At her deposition, Fishel testified that on July 6, 2018, she met with plaintiff at her office for approximately three hours to prepare for the hearing. They discussed plaintiff's job history and reviewed his medical records, including his varying descriptions of why he fell. However, they did not discuss how often plaintiff stood up from and sat down in his chair while working, as Fishel did not anticipate a dispute on that issue at the hearing.

¶ 24    At the arbitration hearing, plaintiff had to prove by a preponderance of the evidence (1) that he sustained an accidental injury "arising out of" and "in the course" of his employment and (2) a causal relationship between his condition of ill-being and his employment. 820 ILCS 305/2 (West 2016); *Boyd Electric v. Dee*, 356 Ill. App. 3d 851, 860 (2005).

¶ 25    Plaintiff was the first witness. He testified that he was working in a Jewel recoup room on the night of June 13, 2017. The recoup room was "congested" with totes and pallets. Plaintiff was walking toward his chair when he tripped on a tote, fell, and landed on his tailbone. He tripped because there was no "walking room," which forced him to step over the tote and a corner of a pallet. Plaintiff acknowledged that he told some of his treaters that he fell after missing a chair while sitting. However, he explained that he missed the chair *because* he tripped on a tote. After falling, plaintiff remained on the floor for "about eight to ten minutes," although "it seemed like [he] was there forever." When plaintiff was able to move, he "pulled the tote up under [his] leg,"

stood, and resumed working. Approximately 15 minutes later, plaintiff told Amburn that he "fell and tripped over a tote" and that he was experiencing back pain. Plaintiff continued working until approximately 3:45 a.m. on June 14, 2017, when he and Amburn completed an incident report. At approximately 5 a.m., plaintiff went to Gottlieb Memorial Hospital's emergency room. Plaintiff testified to the medical treatment he received including surgery. Finally, plaintiff testified that Dr. Tack conducted an IME on April 11, 2018, but did not testify to any diagnoses or opinions Dr. Tack rendered.

¶ 26    After plaintiff completed his testimony, Jewel's counsel played a video recording from a surveillance camera in the recoup room. Fishel did not know this video existed until Jewel's counsel began playing it. Neither she nor plaintiff had ever seen the video. Nevertheless, the arbitrator incorrectly assumed that plaintiff had seen the video, stating, "I'm sure he's seen it before."

¶ 27    The video, which is in the record on appeal, depicts plaintiff and a coworker in a warehouse. Both men are on the opposite side of the warehouse from the camera. The video depicts plaintiff's fall at 11 p.m. Plaintiff stands near a large white container, then walks forward toward a chair. Plaintiff turns to sit in the chair but misses and falls to the left side of the chair, landing on his backside on the floor. The video does not show whether plaintiff tripped on anything as the area around his lower legs is obscured. Approximately five seconds after falling, plaintiff gets up, sits in the chair, and resumes working.

¶ 28    Amburn was Jewel's sole witness at the arbitration hearing. He described the events depicted in the video as Jewel's counsel played it. According to Amburn, from 10:46 p.m. to 10:59 p.m., plaintiff assembled boxes and "work[ed on] some product that's on one of the tables or

possibly down by his feet." Plaintiff sat in his chair for most of that time but sometimes walked around the warehouse to move items. At 11 p.m., plaintiff was "working a pallet" while standing. Plaintiff walked toward his chair, "turn[ed] to sit and fell on his backside." Amburn could not see plaintiff stepping over anything or tripping immediately before he fell. However, Amburn acknowledged that the video did not depict plaintiff "from the knee down," and the arbitrator agreed that "you really can't see him from the knee down." On cross-examination, Amburn acknowledged that there could have been totes near plaintiff's feet. Within five seconds of falling, plaintiff returned to his chair. Approximately 40 seconds after that, plaintiff "continu[ed] his normal work for the day," "either at the table or throwing some product into the white [dumpster]."

¶ 29    Amburn also testified regarding a second, longer video that depicted the recoup room after plaintiff's fall at 11 p.m. While viewing that video, Amburn testified that the recoup room was less crowded than normal on June 13, 2017, and that there were "easy pathways to move throughout" the room. Products were within yellow safety lines as they were supposed to be. This video showed plaintiff, within seconds of his fall, resuming work activities such as "throwing product away, making boxes, [and] filling boxes with product." Plaintiff later stood up from his chair and "stacked a box onto a pallet." Plaintiff continued working until at least 11:44 p.m. During that time, plaintiff alternated between being "seated or standing."

¶ 30    Fishel recalled plaintiff in rebuttal. Plaintiff testified that there were three or four totes on the floor in his work area, which the video did not depict. He claimed that another camera angle would show those totes as well as his "congested" work area. Plaintiff again testified that he had "no work space," was "forced to walk over" the totes and tripped on one of them. When Jewel's attorney confronted plaintiff with the fact that the video showed him on the ground for only five

seconds, not 8 to 10 minutes, plaintiff responded, "All I know is that I was in pain. I told my supervisor, and everyone look at the camera. I blanked out. I hurted [*sic*] so bad. All I know is that I got up, and then I continued to work, and then the pain came afterward."

¶ 31 Fishel moved into evidence plaintiff's medical records from Concentra and the VA hospital, a "Gottlieb ER note" from plaintiff's second visit to the emergency room on July 7, 2017, physical therapy bills, "a report closing the case from the nurse case manager," and a June 20, 2018, "off work slip." Fishel stated she did not have plaintiff's medical records from his treatment at Gottlieb Memorial Hospital's emergency room on June 14, 2017.

¶ 32 Jewel moved into evidence the video, plaintiff's medical records from Loretto Hospital dating to 2010, and plaintiff's workers' compensation claim.

¶ 33 Neither party called Dr. Tack or introduced his IME report.

¶ 34                                    5. Post-Hearing Events

¶ 35 Two days after the arbitration hearing, Fishel sent plaintiff a letter stating that she was "dumbfounded" when she saw the video showing that he "stood up after 4-5 seconds and resumed [his] work duties," which contradicted his testimony that he was on the floor for 8 to 10 minutes after falling. Fishel also documented a post-hearing conversation in which she advised plaintiff that (1) the video rendered him not credible; (2) the arbitrator clearly did not believe him and would order him to refund more than $39,000 in benefits; and (3) shortly after the hearing, plaintiff rejected a settlement offer of $4,686.58 and said he "would take [his] chances with an appeal." Finally, Fishel advised plaintiff as follows:

>"In my professional opinion, if you do not change your mind about accepting the July 9th settlement offer, it is more likely than not that you will receive no monies for your injury

and that you could be liable for the monies already paid to you if the arbitrator's decision awards your employer credit for any benefits paid. Therefore, my best professional advice is to settle, retain the $39,000+ in benefits already paid and take the additional $4,686.56 offered." (Emphasis in original.)

¶ 36    On July 13, 2018, Fishel filed a motion to reopen the proofs to introduce additional video evidence. She argued that (1) the video introduced at the arbitration hearing "was of poor quality and it was difficult to see the movement of [plaintiff];" (2) there was another surveillance camera that would show a better view of plaintiff's work area; and (3) the video of plaintiff's fall "might have been edited." Fishel later withdrew this motion.

¶ 37    On August 10, 2018, Fishel submitted proposed findings of fact and conclusions of law to the arbitrator. Fishel's proposed findings argued that plaintiff's injuries arose "out of and in the course of his employment" because the video showed him falling at work. Fishel also contended that plaintiff's medical records "document[ed] an injury to the cervical spine after [plaintiff's] fall at work on June 13, 2017," thereby establishing the causation element of his claim. Fishel urged the arbitrator to presume that Dr. Tack's IME report was unfavorable to Jewel because Jewel did not introduce it. Fishel conceded that plaintiff's "account of the timing of his activities immediately following the fall was not accurate," but argued that he "truly believed that he was on the floor for many minutes after the fall." Fishel's proposed findings did not cite any legal authority.

¶ 38                                6. Arbitrator's Decision

¶ 39    On August 29, 2018, the arbitrator issued written findings of fact and conclusions of law. The arbitrator found that plaintiff did not prove that (1) his fall arose out of and in the course of his employment or (2) his condition of ill-being was causally related to the fall.

¶ 40    Regarding the first element, the arbitrator found that plaintiff fell because he missed his chair while sitting down. The arbitrator concluded that was a "neutral risk" because plaintiff "would have been equally exposed to [it] apart from his work for the employer." The arbitrator found that plaintiff's injury resulting from a "neutral risk" was non-compensable under the Act because he "presented no evidence *** to establish that he was quantitatively or qualitatively exposed to the risk to a greater degree than the general public."

¶ 41    As to causation, the arbitrator rejected the medical records Fishel submitted because none of plaintiffs' treaters viewed the video of his fall. Therefore, the arbitrator found that plaintiff presented no evidence that his fall caused injuries to his neck or back. In the arbitrator's opinion, plaintiff likely suffered a tailbone injury if he suffered any injury at all, and any neck or back pain he experienced was due to preexisting conditions as reflected in his Loretto Hospital records dating to 2010. The arbitrator construed plaintiff not introducing emergency room records against him, presuming that "the ER records, if they exist, are not helpful to [his] claim."

¶ 42    With respect to both elements, the arbitrator emphasized what he described as plaintiff's lack of credibility. For example, plaintiff testified that his work area was "congested," but Amburn testified that the recoup room was less crowded than usual on June 13, 2017. Plaintiff testified that he fell because he tripped over a tote, but the video showed that plaintiff "simply misjudged where he was in relation to the chair as he attempted to sit." Plaintiff testified that he was on the floor for 8 to 10 minutes after falling, but the video showed that he stood up after approximately five seconds. The arbitrator also highlighted plaintiff's "conflicting reports of the alleged mechanism of injury to various treating physicians."

¶ 43    The arbitrator denied plaintiff workers' compensation benefits and found that Jewel was entitled to credits totaling $40,157.25 for benefits it had already paid plaintiff.

¶ 44                                7. Post-Decision Events

¶ 45    On August 31, 2018, Fishel sent plaintiff a letter enclosing the arbitrator's decision and advised him that he had 30 days to appeal it to the Commission. Fishel's letter also stated, **"It is important for you to understand that I will not be representing you in this appeal."** (Emphasis in original.)

¶ 46    On September 9, 2018, plaintiff e-mailed Fishel, stating, "[I]f you're my Attorney and still advocate on my behalf, I'm asking you at this moment to file for Appeal for Review on my behalf and advise me what are my alternatives to help in my defense to help my Case upon review." On September 11, 2018, Fishel e-mailed plaintiff, stating, "I will file the review for you and I will send you the filed copy. This will buy you some time. However, please understand, that I will not be handling the review for you as I have requested to withdraw as your attorney." At her deposition, Fishel explained that she agreed to file the appeal for plaintiff because she "felt sorry for" him and "didn't want to leave him in a lurch." However, she did not file the appeal because at some point after September 11, 2018, plaintiff said he would file the appeal himself and that he did not want her to do it. On September 13, 2018, plaintiff filed a *pro se* appeal to the Commission. On September 24, 2018, the arbitrator granted Fishel's motion to withdraw. On February 28, 2019, the Commission confirmed the arbitrator's decision.

¶ 47    On July 7, 2020, plaintiff filed this legal malpractice suit against defendants.

¶ 48                                B. Summary Judgment

¶ 49    Defendants moved for summary judgment, arguing that plaintiff could not establish the proximate causation element of his legal malpractice claim because he would have lost the underlying workers' compensation case regardless of what Fishel did. Defendants primarily contended that, upon seeing the video for the first time at the arbitration hearing, Fishel correctly maintained the theory that plaintiff tripped on a tote rather than pivoting to a theory that missing the chair was a compensable workplace injury. Defendants argued that Fishel did the best she could to convince the arbitrator that the video did not disprove that plaintiff tripped on a tote. In addition, defendants contended that Fishel not pivoting to the "missed chair" theory was an "informed, good-faith tactical" decision that entitled her to immunity. Furthermore, defendants contended that any theory that plaintiff falling due to missing his chair was a compensable workplace injury would have failed as a matter of law because plaintiff's use of a chair was a personal convenience unrelated to his job duties, and his job description prohibited him from using a chair anyway. Defendants attached plaintiff's job description as an exhibit to their motion. The job description states that plaintiff could sit "only during breaks" and should sit "0 Hrs" while working. At the arbitration hearing, Jewel did not introduce this job description or make this argument.

¶ 50    Additionally, defendants argued that Fishel not obtaining the video of plaintiff's fall prior to the arbitration hearing did not cause him to lose his workers' compensation case because when plaintiff saw the video at the arbitration hearing, he refused to change his testimony that he tripped over a tote. Therefore, any preparation Fishel might have done with him would have been ineffective. Defendants also contended that Fishel introducing the IME report would have compounded plaintiff's "credibility issues" because the report was based on medical records that

were based on plaintiff's varying descriptions of why he fell. Finally, defendants argued that Fishel had no duty to appeal the arbitrator's decision to the Commission because she advised plaintiff that she would not represent him in such an appeal.

¶ 51 In response, plaintiff argued that Fishel did not develop or present any evidence that his injury caused by missing a chair while sitting down was compensable because it was either (1) a risk distinctly associated with his job duties or (2) a neutral risk, but one to which he was quantitatively more exposed than the general public because he stood from and sat in his chair 200 to 300 times per shift. Fishel presenting no evidence on this essential element caused the arbitrator to find that plaintiff's injury did not arise out of his employment. Plaintiff also contended that Fishel could not have made an informed, good-faith tactical decision not to present this evidence because she did not even realize that Jewel would argue that plaintiff missing his chair was a non-compensable neutral risk. Plaintiff objected to defendants' submission of his job description, arguing that there was no foundation for or authentication of that document.

¶ 52 Additionally, plaintiff contended that Fishel never obtained the IME report, never requested or subpoenaed it from Dr. Tack, and never sought Dr. Tack's testimony at a deposition or the arbitration hearing. Plaintiff maintained that Fishel could have obtained Dr. Tack's opinions prior to the arbitration hearing, in which case she would have realized that they were favorable evidence for plaintiff, and then introduced them at the hearing. In that scenario, Dr. Tack would have provided unrebutted expert medical evidence that plaintiff's fall at work caused an injury to his cervical spine and aggravated a preexisting condition in his lumbar spine. Dr. Tack also would have explained that plaintiff's varying descriptions of why he fell were irrelevant to the issue of causation. Furthermore, if Fishel had obtained the IME report, she would have realized there was

a video of plaintiff's fall because the IME report referred to the video. Finally, plaintiff argued that Fishel breached her promise to appeal the arbitrator's decision to the Commission. In support of that argument, plaintiff attached Fishel's September 11, 2018, email to plaintiff.

¶ 53    Defendants' reply argued that plaintiff's "own lies" about why he fell "torpedoed his case, and nothing Fishel could have done would have changed the outcome." Defendants also argued that plaintiff missing a chair was not a compensable risk because (1) Jewel expressly prohibited plaintiff from sitting during his shift; (2) even if plaintiff's supervisor permitted him to sit at times while working, that was merely a personal convenience unrelated to plaintiff's job duties; and (3) an employer's acquiescence cannot convert a personal risk into an employment risk. Finally, defendants contended they laid proper foundation and authentication for plaintiff's job description via a records custodian certification from Jewel.

¶ 54    The circuit court granted defendants' motion for summary judgment, finding that plaintiff did "not create[ ] a genuine issue of material fact as to the element of causation." Although Fishel may have been able to establish that plaintiff's injury due to missing his chair arose out of his employment, that would not have "cure[d] the deficiency as to causal connection" in the workers' compensation case. Even if Fishel introduced Dr. Tack's opinions, the arbitrator would have rejected them for the same reason he rejected plaintiff's treaters' opinions; namely, that all the doctors' opinions were "based on an inconsistent history as proffered by [p]laintiff." The court found it "of no consequence that Dr. Tack reviewed the surveillance video" because that video did not clearly show whether plaintiff tripped or missed his chair. The court noted that plaintiff refused to change his testimony after seeing the video at the arbitration hearing. Finally, the court concluded that plaintiff's allegation that Fishel promised to appeal the arbitrator's decision to the

Commission was a "[s]elf-serving declaration" unsupported by record evidence. (Internal quotation marks omitted.)

¶ 55                                    C. Motion to Reconsider

¶ 56    Plaintiff filed a motion to reconsider. He argued that a court should "never" decide the causation element of a legal malpractice claim at summary judgment, citing *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 210 (2006), and *Nettleton v. Stogsdill*, 387 Ill. App. 3d 743, 753 (2008). Relevant here, plaintiff contended that the record established that Fishel failed to obtain and introduce key medical evidence—the IME report and emergency room records—showing that plaintiff's fall caused his injuries. Plaintiff maintained that a jury had to decide whether Fishel not introducing that evidence caused him to lose his workers' compensation claim. Plaintiff also argued that the court ignored the September 11, 2018, email in which Fishel promised to file an appeal to the commission, which he had attached to his summary judgment response as exhibit L.

¶ 57    In response, defendants argued that plaintiff rehashed arguments about the medical evidence, which the circuit court had already rejected. Defendants also contended that Fishel clearly communicated to plaintiff that she would *not* represent him in an appeal to the Commission.

¶ 58    The circuit court denied plaintiff's motion to reconsider. As to Fishel's handling of the medical records, the court reasoned that it could "only determine if reasonable minds would differ if there are undisputed facts. Plaintiff contends the facts are disputed, so the Court did not and will not analyze this argument." The court found that plaintiff had "not created any genuine issue of material fact that if the arbitrator were to have had additional medical reports and records that [plaintiff] would have prevailed in the underlying claim." In addition, the court found that "Fishel

only agreed to file the review but *** someone else had to handle the matter as Fishel would be withdrawing as counsel." The court again concluded that plaintiff did "not indicate by what means Fishel communicated that she would help him with his appeal."

¶ 59    Plaintiff timely appealed.

¶ 60                                    II. ANALYSIS

¶ 61    Plaintiff contends that summary judgment was improper because there are both factual disputes and differing inferences a reasonable factfinder could draw from undisputed facts regarding whether Fishel's negligence in handling his workers' compensation case caused him to lose that case. Plaintiff also argues that the circuit court misapprehended the record about whether Fishel had a duty to appeal the arbitrator's decision to the Commission.

¶ 62                          A. Summary Judgment Standard

¶ 63    Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). We review a grant of summary judgment *de novo* (*Suburban Real Estate Services, Inc. v. Carlson*, 2022 IL 126935, ¶ 15), meaning we perform the same analysis as the circuit court (*Zweig v. Miller*, 2020 IL App (1st) 191409, ¶ 24). We construe the record strictly against defendants and liberally in plaintiff's favor. See *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280 (2007). A court should grant summary judgment only "if the movant's right to judgment is clear and free from doubt." (Internal quotation marks omitted.) *Haase v. Kankakee School District 111*, 2025 IL 131420, ¶ 29.

¶ 64    We must clarify the summary judgment standard as it applies to this case because that issue caused some confusion with respect to plaintiff's motion to reconsider. A court must deny summary judgment in two scenarios: (1) when the parties dispute material facts or (2) when the material facts are undisputed, but reasonable people could draw differing inferences from them. *Id.* This case involves both scenarios. The parties dispute some material facts, such as whether Fishel could have obtained the IME report or the video of plaintiff's fall. These disputes of fact preclude summary judgment. See *id.*

¶ 65    Other facts are undisputed. For example, there is no dispute that Fishel did not introduce Dr. Tack's opinions at the arbitration hearing. Reasonable jurors could draw different inferences about how the absence of Dr. Tack's opinions affected the arbitrator's decision. As we explain below, a reasonable juror could conclude that Dr. Tack's opinions would have established that plaintiff's fall caused his injuries and rebutted almost every reason the arbitrator cited for ruling against plaintiff. Another reasonable juror could conclude that although Dr. Tack's opinions were favorable evidence to plaintiff, they would not have outweighed plaintiff's "credibility issues." These divergent inferences from the undisputed facts preclude summary judgment as well. See *id.*

¶ 66    In ruling on the motion to reconsider, the circuit court suggested that plaintiff had to choose one of two mutually exclusive theories in opposing summary judgment: Plaintiff could argue either that the parties disputed *all* material facts *or* that the parties disputed *no* material facts, but reasonable people could draw different inferences from them. That is not quite correct. This case involves many material facts, some of which the parties dispute and some they do not dispute. For each material fact, we must determine whether that fact is (1) disputed or (2) undisputed but

capable of supporting differing reasonable inferences. See *id.* If either situation is the case, then summary judgment is unwarranted. *Id.*

¶ 67 This case involves one count of legal malpractice. In a legal malpractice action, the plaintiff claims he would have won an underlying case but for his attorney's negligence in litigating that case. *Tuna v. Wisner*, 2023 IL App (1st) 211327, ¶ 33.

> "To prevail in an action for legal malpractice, plaintiff must prove the following elements:
> (1) the existence of an attorney-client relationship that establishes a duty on the part of the
> attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate
> cause establishing that but for the attorney's negligence, the plaintiff would have prevailed
> in the underlying action; and (4) damages." *First National Bank of LaGrange v. Lowrey*,
> 375 Ill. App. 3d 181, 196 (2007).

¶ 68 This case focuses on the third element, proximate causation. In a legal malpractice claim, a plaintiff must show that his attorney's negligent representation proximately caused him to lose the underlying case. *Tuna*, 2023 IL App (1st) 211327, ¶ 33. " 'The issue of proximate causation in a legal malpractice setting is generally considered a factual issue to be decided by the trier of fact.' " *Nettleton*, 387 Ill. App. 3d at 753 (quoting *Judge*, 221 Ill. 2d at 210). "The issue of proximate causation should never be decided as a matter of law where reasonable persons could reach different results." *Id.* (citing *Judge*, 221 Ill. 2d at 210). A court may decide proximate cause as a matter of law only when the facts are undisputed *and* reasonable people could not draw different inferences from those facts. *Id.* (citing *Public Taxi Service, Inc. v. Barrett*, 44 Ill. App. 3d 452, 456 (1976)).

¶ 69    To conduct the causation analysis, we must consider what plaintiff had to prove to win his workers' compensation case, why he lost, and whether Fishel caused that loss. Courts refer to this as the "case within a case" analysis. *Tuna*, 2023 IL App (1st) 211327, ¶ 33. In his workers' compensation case, plaintiff had to prove (1) that he suffered an "injury which arose out of and in the course of his employment" and (2) a causal connection between his condition of ill-being and employment. See *Sisbro, Inc., v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003); *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 63 (1989). The arbitrator found that plaintiff did not prove either of these elements. The question is whether Fishel caused plaintiff's failure to prove those elements.

¶ 70    Citing *Lowrey*, defendants argue that only a judge, not a jury, can evaluate why plaintiff lost his underlying workers' compensation claim. *Lowrey* holds that, in a legal malpractice case, whether the judge in the underlying case would have approved a settlement is a question of law that a court, not a jury, must resolve. *Lowrey*, 375 Ill. App. 3d at 203. Unlike *Lowrey*, this case does not involve a dispute regarding whether the arbitrator would have approved a settlement. To the extent defendants suggest that plaintiff's legal malpractice claim can never reach a jury trial and must be decided at summary judgment, we disagree.

¶ 71    We now turn to the areas in which the parties dispute material facts and in which reasonable factfinders could draw differing inferences from the undisputed facts.

¶ 72                                B. IME Report

¶ 73    In a workers' compensation case, an employer can require the employee to undergo an IME. 820 ILCS 305/12 (West 2018); *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 403-04 (2005). Section 12 of the Act provides that

"[a]n employee entitled to receive disability payments shall be required, if requested by the employer, to submit himself, at the expense of the employer, for examination to a duly qualified medical practitioner or surgeon selected by the employer, at any time and place reasonably convenient for the employee, either within or without the State of Illinois, for the purpose of determining the nature, extent and probable duration of the injury received by the employee, and for the purpose of ascertaining the amount of compensation which may be due the employee from time to time for disability according to the provisions of this Act." 820 ILCS 305/12 (West 2018).

Section 12 further provides that

"[i]n all cases where the examination is made by a surgeon engaged by the employer, and the injured employee has no surgeon present at such examination, it shall be the duty of the surgeon making the examination at the instance of the employer to deliver to the injured employee, or his representative, a statement in writing of the condition and extent of the injury to the same extent that said surgeon reports to the employer and the same shall be an exact copy of that furnished to the employer, said copy to be furnished the employee, or his representative as soon as practicable but not later than 48 hours before the time the case is set for hearing." *Id.*

In short, the employee's attorney must receive a copy of the IME report no later than 48 hours before an arbitration hearing. *Mulligan v. Illinois Workers' Compensation Comm'n*, 408 Ill. App. 3d 205, 218-19 (2011); *Ghere v. Industrial Comm'n*, 278 Ill. App. 3d 840, 845 (1996). The parties can introduce the IME doctor's opinions at a workers' compensation arbitration hearing. See, *e.g.*,

*Schroeder v. Illinois Workers' Compensation Comm'n*, 2017 IL App (4th) 160192WC, ¶ 17; *Esquinca v. Illinois Workers' Compensation Comm'n*, 2016 IL App (1st) 150706WC, ¶ 29.

¶ 74     There is no dispute Fishel knew that plaintiff underwent an IME and that there was an IME report. There is also no dispute Fishel never obtained the IME report and never learned what Dr. Tack's opinions were by deposing him or calling him at the arbitration hearing. At her deposition, Fishel conceded that she never saw Dr. Tack's report and had "no idea what Dr. Tac[k] said." Similarly, in her response to requests to admit (see Ill. S. Ct. R. 216 (eff. July 1, 2014)), Fishel admitted that she did not obtain the IME report or depose Dr. Tack. Because Fishel never knew what Dr. Tack's opinions were, she cannot have made *informed*, good-faith tactical decisions about them. See *Nelson v. Quarles and Brady, LLP*, 2013 IL App (1st) 123122, ¶ 31. Therefore, she is not entitled to "judgmental immunity" as defendants claim.

¶ 75     The parties dispute whether Fishel could have obtained the IME report or Dr. Tack's opinions prior to the arbitration hearing. Plaintiff's expert, attorney Patrick Jennetten, opines that Fishel could have discovered Dr. Tack's opinions by requesting the IME report from him pursuant to section 12, seeking a *dedimus potestatem* for Dr. Tack's report or his testimony pursuant to section 16 of the Act (see 820 ILCS 305/16 (West 2018)), or subpoenaing him pursuant to the Illinois Administrative Code (see 50 Ill. Admin. Code 9030.50 (2016)). Defendants' expert, attorney Marc Perper, opines that although Fishel could have tried to obtain Dr. Tack's opinions through these discovery mechanisms, there is no meaningful way to enforce them in workers' compensation cases. This disagreement between experts means that a factfinder must decide this issue. See *In re Estate of Walter*, 2023 IL App (1st) 211600, ¶ 48 ("This court has held that

conflicting expert opinions demonstrate that factual issues exist. *** Furthermore, it is well established that the trier of fact considers the weight to be given to conflicting expert opinions.").

¶ 76    Even if defendants' expert is correct, Dr. Tack's affidavit provides a basis for concluding that Fishel could have obtained his opinions in this case. Dr. Tack attests as follows:

> "If I had been subpoenaed to testify at the workers compensation trial on July 9, 201[8], or if I was subpoenaed for deposition prior to the workers compensation trial, I would have appeared, brought [plaintiff's] entire file, including the IME report of April 11, 2018; and I would have testified consistently with the IME report of April 11, 2018, as well as how the viewing of the video did not change any of my opinions.

> ***

> If the IME report dated April 11, 2018, had been subpoenaed or requested directly from me or Illinois Bone and Joint Institute by [plaintiff's] workers compensation attorney, whether before the workers compensation trial or at the time of the workers compensation trial, the IME report dated April 11, 2018, would have been provided to [plaintiff's] workers compensation attorney accordingly."

Furthermore, the record shows that Fishel issued a subpoena to Dr. Leslie Schaffer on February 9, 2018, and that Dr. Schaffer responded to that subpoena. That discovery exchange undermines Fishel's claim that subpoenas are ineffective in workers' compensation cases. Therefore, a factfinder must resolve whether Fishel could have discovered Dr. Tack's opinions before the arbitration hearing.

¶ 77    Because Fishel never discovered Dr. Tack's opinions, she did not introduce them at the arbitration hearing. Jewel did not introduce them either, presumably because they were unhelpful

to Jewel's case and favorable to plaintiff's case. As a result, the arbitrator knew only *that* Dr. Tack conducted an IME of plaintiff but did not know *what* Dr. Tack's opinions were. That is undisputed.

¶ 78    A reasonable jury could infer this absence of evidence caused plaintiff to lose his workers' compensation case. The arbitrator found no evidence that plaintiff's fall at work on June 13, 2017, caused injuries to his cervical or lumbar spine; therefore, plaintiff did not prove a causal connection between his condition of ill-being and his employment. See *Caterpillar*, 129 Ill. 2d at 63. But Dr. Tack opined that plaintiff's fall *did* cause a herniated disc in his cervical spine and exacerbated spondylosis in his lumbar spine. Dr. Tack would have provided precisely the evidence of causation the arbitrator found missing. So, it is reasonable to think that introducing Dr. Tack's opinions would have changed the arbitrator's decision. That is particularly true where Dr. Tack's opinions (1) would have been unrebutted at the arbitration hearing; (2) were based on MRIs that did not depend on plaintiff's varying descriptions of why he fell; and (3) did not change after viewing the video. Case law suggests that if Dr. Tack had been the only medical expert to testify, the arbitrator would not have been free to reject his opinions. See, *e.g.*, *Phillips v. Industrial Comm'n*, 187 Ill. App. 3d 704, 707 (1989) ("Where claimant proves causation with unrebutted expert medical testimony which sufficiently supports a finding of causal connection, a reviewing court may set aside the Commission's decision finding no causation."); *Dean v. Industrial Comm'n*, 143 Ill. App. 3d 339, 345 (1986) (the Industrial Commission erred in discounting the sole medical expert's testimony as to causation).

¶ 79    Furthermore, Dr. Tack would have rebutted almost every reason the arbitrator cited for ruling against plaintiff. Most importantly, Dr. Tack would have explained that plaintiff's "credibility issues," which the arbitrator emphasized, were irrelevant to causation. Dr. Tack's

affidavit explains that "[t]he mechanism of injury that caused [plaintiff's] injuries of June 13, 2017, was the fall itself. For purposes of my medical opinions, how [plaintiff] fell is irrelevant." At his deposition, Dr. Tack went even further, explaining that the video was *consistent* with plaintiff's account because it showed plaintiff falling "on his rear-end which is exactly what he told" Dr. Tack.

¶ 80    The arbitrator also found that plaintiff was not credible because he testified that he remained on the floor for 8 to 10 minutes after falling, but the video showed him on the floor for just five seconds. Dr. Tack would have explained that "[t]he amount of time [plaintiff] spent on the ground, whether seconds or minutes, does not matter from a medical standpoint as to the cause of the injuries sustained by [plaintiff] on June 13, 2017." At his deposition, Dr. Tack testified as follows:

> "Well, obviously it looks like he sat down and continued doing something while sitting down. So if that's a discrepancy, that's a discrepancy. But as I said it does not change any of the medical opinions because whether or not he resumed full activities in 10 to 15 minutes or whatever does not change the fact that he appears to have had a minor fall and I cannot argue with that. The video shows *** he had a minor fall onto his rear-end just like he told me."

¶ 81    The arbitrator found "no evidence on surveillance [video] of an acute injury, aggravation, or exacerbation to [plaintiff's] neck or back." Dr. Tack, who reviewed the video, found precisely those injuries. He diagnosed an acute injury to plaintiff's cervical spine (his neck) and exacerbation of spondylosis in his lumbar spine (his lower back).

¶ 82    The arbitrator rejected plaintiff's medical records because "[n]o evidence was presented at trial to suggest that any of the treating physicians reviewed the surveillance footage of the alleged accident." But Dr. Tack *did* review the video, and it did not change his opinion that plaintiff's "fall that occurred at work on June 13, 201[7], which was captured on video, was the proximate cause of [plaintiff's] injuries." A reasonable factfinder could conclude that Dr. Tack would have resolved almost every doubt the arbitrator had about plaintiff's case.

¶ 83    In addition, a jury must evaluate Fishel's reasons for not introducing Dr. Tack's opinions at the arbitration hearing. Fishel claims the arbitrator told her he would construe Jewel not introducing the IME report in plaintiff's favor as having proved causation. But neither the arbitration hearing transcript nor the arbitrator's decision contain such a statement. A jury must decide whether the arbitrator told Fishel that and, if he did, whether it was reasonable for Fishel to rely on that statement to carry plaintiff's burden of proof as to causation.

¶ 84    Defendants argue that the arbitrator would have rejected Dr. Tack's opinions for the same reason he rejected plaintiff's medical records; namely, because they were based on a "false history presented by [plaintiff] regarding the alleged mechanism of injury." A reasonable jury could reach that conclusion. But a reasonable jury could also conclude that Dr. Tack would have explained to the arbitrator why plaintiff's varying descriptions of his fall were irrelevant. At his deposition, Dr. Tack explained that "the exact cause of the fall does not matter" because "[w]hatever caused him to fall was a minor injury but minor injuries can precipitate things that are problematic." But in Dr. Tack's absence, nobody even tried to explain to the arbitrator that plaintiff's "credibility issues" simply did not matter to causation.

¶ 85    Defendants also argue that Fishel *did* present evidence—medical records—that plaintiff's fall caused the herniated disc in his cervical spine. The medical records Fishel introduced reflect that plaintiff fell at work in June 2017, and they document a herniated disc in his cervical spine. But they do not clearly state that plaintiff's fall at work on June 13, 2017, *caused* the herniated disc in plaintiff's cervical spine. This clear causal connection was essential because without it, Jewel could argue and the arbitrator could find that plaintiff's neck and back pain resulted from plaintiff's several preexisting conditions. That is exactly what happened. And, in any event, Fishel's presentation of the medical records was clearly ineffective. The arbitrator rejected the medical records Fishel submitted because plaintiff's treaters did not view the video and because they based their diagnoses on plaintiff's supposedly "false history" of his fall. As explained above, Dr. Tack would have addressed both of those issues.

¶ 86    Dr. Tack unambiguously found a causal connection between plaintiff's fall and his herniated disc. His IME report states that plaintiff "sustained a herniated cervical disc at the C6-C7" and "the cervical disc herniation does relat[e] to the occupational incident of June 13, 2017." Similarly, Dr. Tack's affidavit states that plaintiff's "fall that occurred at work on June 13, 201[7], which was captured on video, *was the proximate cause* of [plaintiff's] injuries as referenced in my IME report." (Emphasis added.) A reasonable factfinder could conclude that Dr. Tack's opinions would have carried plaintiff's burden of proof as to causation.

¶ 87    To that point, defendants complain about "speculation" regarding how Dr. Tack's opinions would have changed the arbitrator's findings. This complaint is without merit. A jury can review the arbitrator's written reasons for why plaintiff lost, compare them to the evidence Fishel should have presented, and draw reasonable inferences about what would have happened if Fishel had

introduced that evidence. That is exactly what a jury must do in a legal malpractice case. See *Goldfine v. Barack, Ferrazzano, Kirschbaum and Perlman*, 2014 IL 116362, ¶ 24 ("In order to recover damages in a legal malpractice action in Illinois, a plaintiff must establish what the result would have been in the underlying action." (Internal quotation marks omitted.)). Accordingly, a factfinder must decide whether Fishel's decision not to obtain or introduce Dr. Tack's opinions caused plaintiff to lose his workers' compensation case.

¶ 88                    C. Injury Arising Out of Employment

¶ 89    A workers' compensation claimant's injury must "aris[e] out of" and occur "in the course of" the claimant's employment. 820 ILCS 305/1(d) (West 2016); *McAllister v. Illinois Workers' Compensation Comm'n*, 2020 IL 124848, ¶ 32. These are two different elements, and a claimant must establish both. *McAllister*, 2020 IL 124848, ¶ 32.

¶ 90    "The phrase 'in the course of employment' refers to the time, place, and circumstances of the injury." *Id.* ¶ 34. "A compensable injury occurs in the course of employment when it is sustained while a claimant is at work or while he performs reasonable activities in conjunction with his employment." (Internal quotation marks omitted.) *Id.* In this case, there is no dispute that plaintiff's injury occurred in a Jewel warehouse while he was on the clock, so his injury occurred in the course of his employment. Although the arbitrator found that plaintiff's injury did not occur in the course *or* arise out of his employment, that was imprecise wording. The substance of the decision shows the arbitrator found that plaintiff did not prove that his injury *arose out of* his employment. The parties agree on this point.

¶ 91    To satisfy the "arising out of employment" element, a claimant must show that his injury originated in a risk connected with or incidental to his employment. *Sisbro*, 207 Ill. 2d at 203. To

determine whether a claimant's injury arose out of his employment, a court or an arbitrator must categorize the risks to which the claimant was exposed. See *id.*

¶ 92    "Generally, all risks to which a claimant may be exposed fall within one of three categories." *McAllister*, 2020 IL 124848, ¶ 38. The three categories are "(1) risks distinctly associated with the employment; (2) risks personal to the employee; and (3) neutral risks which have no particular employment or personal characteristics." (Internal quotation marks omitted.) *Id.* The first and third categories are relevant here. The first category, employment risks, "include[s] the obvious kinds of industrial injuries *** and are universally compensated." *Id.* ¶ 40. The third category, neutral risks, involves risks that have no employment or personal characteristics. *Id.* ¶ 44. "Injuries resulting from a neutral risk generally do not arise out of the employment and are compensable under the Act only where the employee was exposed to the risk to a greater degree than the general public." (Internal quotation marks omitted.) *Id.* "Such an increased risk may be either qualitative, such as some aspect of the employment which contributes to the risk, or quantitative, such as when the employee is exposed to a common risk more frequently than the general public." (Internal quotation marks omitted.) *Id.*

¶ 93    The only argument Fishel made on this element in her proposed findings was as follows: "Given the fact that the video does show an actual fall, the Arbitrator [should] find[ ] that [plaintiff] sustained an accident arising out of and in his employment." Fishel cited no legal authority in support of this argument and did not address the three categories of risk. The arbitrator found that plaintiff did not prove this element. These facts are undisputed.

¶ 94    From these undisputed facts, a reasonable jury could find that Fishel made no meaningful attempt to prove this essential element of plaintiff's workers' compensation claim. The evidence

and case law available to Fishel supported three theories that would have established the "arising out of employment" element. First, Fishel could have argued that tripping over a tote was an employment risk because Jewel required plaintiff to use totes to sort damaged products. See *Sisbro*, 207 Ill. 2d at 204 (an injury arises out employment if the employee was performing acts his employer instructed him to perform); *First Cash Financial Services v. Industrial Comm'n*, 367 Ill. App. 3d 102, 106 (2006) (tripping on a defect at the employer's premises is an employment risk). The evidence arguably supported this theory. Plaintiff testified that he missed his chair because he tripped on a tote. Amburn and the arbitrator agreed that the video did not *dis*prove that plaintiff tripped on a tote.

¶ 95 Alternatively, Fishel could have argued that even if plaintiff missed his chair while sitting, that was an employment risk. At his deposition, plaintiff testified that he sat in a chair while assembling cardboard boxes and sorting products and stood while moving objects around the recoup room. Amburn agreed that plaintiff intermittently stood up from and sat in his chair while working. This evidence would have given the arbitrator factual support for concluding that plaintiff's injury resulted from risks associated with his employment.

¶ 96 As a third alternative, Fishel could have argued that even if missing a chair was a neutral risk, plaintiff was quantitatively more at risk than the general public because he stood up from and sat down in his chair 200 to 300 times per shift, thereby making the neutral risk compensable. See *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1014 (2011) ("an increased risk may be *** quantitative, such as when the employee is exposed to a common risk more frequently than the general public.").

¶ 97    Before the arbitration hearing, Fishel knew that plaintiff missing his chair was at issue because he told several treaters that was why he fell. Yet Fishel developed no evidence or legal theory to address that scenario. In response to requests to admit, Fishel conceded that she never asked plaintiff "any questions about the use of his chair while at his workplace" or "how often, on a daily basis, [he] change[d] positions (from sitting to standing or standing to sitting) in the use of his chair while at his workplace." At her deposition, Fishel admitted that she never asked plaintiff "whether or not using his chair was incidental to his job." Fishel cannot have made informed tactical decisions about this issue because she never knew how frequently plaintiff stood up and sat down while working. See *Nelson*, 2013 IL App (1st) 123122, ¶ 31.

¶ 98    At the arbitration hearing, Fishel presented no evidence that plaintiff used a chair at work more frequently than the general public. Fishel conceded as much at her deposition, testifying that she "did not submit any evidence about the general public issue, because [plaintiff] told me that he tripped over a tote. I didn't need to submit. It would [not] be relevant." She also believed that arguing that plaintiff missed his chair "would contradict his own testimony." Therefore, she provided the arbitrator no evidentiary basis to conclude that *if* plaintiff fell because he missed his chair, that was a neutral but compensable risk because plaintiff used his chair at work more frequently than the general public.

¶ 99    After the arbitration hearing, Fishel knew that the arbitrator believed plaintiff fell because he missed his chair, not because he tripped on a tote. Yet her proposed findings cited no legal authority that a "neutral risk" is compensable if the claimant is quantitatively more at risk than the general public. See, *e.g.*, *Metropolitan Water Reclamation District*, 407 Ill. App. 3d at 1014. Fishel presented no legal basis for the arbitrator to rule in plaintiff's favor even though such authority

was available to her in 2018. See, *e.g.*, *Adcock v. Illinois Workers' Compensation Comm'n*, 2015 IL App (2d) 130884WC, ¶¶ 33-34 (a welder's injury was compensable under the neutral risk analysis because his job required him to turn in a swivel chair more frequently than the general public) (overruled by *McAllister*, 2020 IL 124848, ¶ 64).[3] Plaintiff's expert opines that by not citing any authority, Fishel did not present an effective legal argument on the "arising out of employment" element. A reasonable jury could conclude that Fishel not developing evidence or argument on this essential element caused plaintiff to lose his workers' compensation claim.

¶ 100 Defendants contend that plaintiff could not have prevailed on this element because Jewel prohibited him from sitting in a chair while working, citing plaintiff's job description. Jewel never took that position at the arbitration hearing, so plaintiff's job description could not have affected the arbitrator's ruling. This argument is a *post hoc* rationalization for why plaintiff could not have won his workers' compensation claim.

¶ 101 Defendants also contend that plaintiff could not have established the "arising out of employment" element because his use of a chair at work was a matter of personal convenience, which is never a compensable risk even if the employer acquiesces to it. The cases defendants cite are distinguishable because they involve employees performing personal tasks, usually while on break. See, *e.g.*, *Orsini v. Industrial Comm'n,* 117 Ill. 2d 38, 47 (1987) (automobile mechanic injured while working on his personal vehicle during work hours with his employer's consent);

---

[3]Two years after plaintiff's workers' compensation case concluded, our supreme court explained that "common bodily movements and everyday activities are compensable and employment related if the common bodily movement resulting in an injury had its origin in some risks connected with, or incidental to, employment so as to create a causal connection between the employment and the accidental injury." *McAllister*, 2020 IL 124848, ¶ 63. The claimant need not "provide additional evidence establishing that he was exposed to the risk of injury, either qualitatively or quantitatively, to a greater degree than the general public." *Id. McAllister* supports a conclusion that plaintiff frequently standing from and sitting in a chair was an employment risk, not a neutral risk.

*Lynch Special Services v. Industrial Comm'n*, 76 Ill. 2d 81, 84-85 (1979) (security guard slipped while returning from a break at a restaurant); *Yost v. Industrial Comm'n*, 76 Ill. 2d 548, 551 (1979) (employee injured while selling candy for a charity drive during a break). By contrast, plaintiff was injured while performing his recoup duties during his shift in his work area.

¶ 102   In any event, there is no indication the arbitrator considered plaintiff's use of a chair at work to be a personal risk. The arbitrator expressly found that plaintiff missing his chair was a neutral risk. So, Fishel had to show that plaintiff was qualitatively or quantitatively more exposed to risk than the general public when he used a chair at work. See *Metropolitan Water Reclamation District*, 407 Ill. App. 3d at 1014. Fishel offered no evidence or legal argument on that point. Accordingly, a reasonable jury could find that she caused plaintiff to lose his workers' compensation case.

¶ 103                                D. Video Evidence

¶ 104   Multiple disputes of fact preclude summary judgment as to Fishel's handling of the video of plaintiff's fall.

¶ 105   First, the parties dispute whether Fishel knew or should have known prior to the arbitration hearing that a video of plaintiff's fall existed. At his deposition, plaintiff testified that he told Fishel there were "cameras in [the] recoup room" that would show his fall. Fishel claims she did not know there was a video of plaintiff's fall until Jewel's counsel surprised her with it at the arbitration hearing. In Fishel's own words, she was "dumbfounded" upon seeing the video evidence for the first time at the arbitration hearing.

¶ 106   Additionally, the parties dispute whether Fishel could have obtained the video before the arbitration hearing. This dispute is essentially the same as the dispute about whether Fishel could

have obtained the IME report. Fishel claims she could not have obtained the video because there is no discovery in workers' compensation cases. Plaintiff's expert opines that Fishel could and should have subpoenaed the video from Jewel. We do know that if Fishel had obtained the IME report, she would have learned that there was a video of plaintiff's fall because the IME report mentioned the video. For the same reasons as the IME report, a factfinder must decide whether Fishel could have obtained the video before the arbitration hearing. And, like the IME report, Fishel cannot have made informed tactical decisions about the video because she did not know it existed until the middle of the arbitration hearing. See *Nelson*, 2013 IL App (1st) 123122, ¶ 31.

¶ 107   Causation is a close call on this issue. On the one hand, a reasonable jury could find that even if Fishel had obtained the video and prepared plaintiff with it, his testimony at the arbitration hearing would not have been different. After seeing the video, plaintiff maintained that he tripped over a tote. He also explained that it *felt* like he was on the floor for several minutes, but whatever length of time the video showed was accurate. It is possible that preparation with the video would not have improved plaintiff's testimony much if at all.

¶ 108   On the other hand, a reasonable jury could find that Fishel did not take simple and obvious steps that would have mitigated plaintiff's "impeachment" with the video. Fishel could have asked for a break or a continuance when she was surprised by the video at the arbitration hearing, as plaintiff's expert explains. Instead, Fishel attempted to address the video impromptu. The arbitration hearing transcript shows that Jewel's counsel was prepared to review the video frame-by-frame whereas Fishel was limited to complaints that she was "having trouble seeing" the video and that the surveillance camera was "really far away" from plaintiff. Fishel did not even correct the arbitrator's assumption that plaintiff had seen the video before. Given how much weight the

arbitrator placed on the video, a reasonable jury could conclude that Fishel's lack of preparation damaged plaintiff's case.

¶ 109   Ultimately, this is a question of whether plaintiff would have been more credible in the arbitrator's eyes had Fishel prepared him with the video. Matters of credibility are for the jury to resolve. *Larkin v. George*, 2016 IL App (1st) 152209, ¶ 19. Likewise, a jury must resolve causation, *i.e.*, the impact of Jewel blindsiding Fishel and plaintiff with the video at the arbitration hearing. See *Judge*, 221 Ill. 2d at 210.

¶ 110                                E. Emergency Room Records

¶ 111   Summary judgment is improper as to the effect of Fishel not obtaining or introducing medical records from plaintiff's June 14, 2017, treatment at Gottlieb Memorial Hospital's emergency room.

¶ 112   This analysis is straightforward. There is no dispute that Fishel did not obtain or introduce plaintiff's emergency room records from his initial visit on June 14, 2017. There is no question that she could have had plaintiff obtain his own medical records from Gottlieb Memorial Hospital. And there is no dispute that the absence of these records affected the arbitrator's decision. The arbitrator noted that plaintiff "did not provide any medical records at trial to verify this ER visit" and presumed that "the ER records, if they exist, are not helpful to [plaintiff's] claim as they were never presented at [the] hearing." The arbitrator also described plaintiff "initially" seeking treatment at Concentra on June 14, 2017, further indicating that the arbitrator did not believe plaintiff went to the emergency room that day.

¶ 113   From these undisputed facts, a reasonable jury could draw differing inferences about the impact of Fishel not introducing plaintiff's emergency room records. A reasonable jury could find

that the arbitrator did not believe plaintiff went to the emergency room, compounding his "credibility issues" and creating a critical lack of medical evidence that his fall caused injuries. On the other hand, a reasonable jury could find that the absence of plaintiff's emergency room records was a relatively minor issue that did not alter the weight of the evidence before the arbitrator. Accordingly, summary judgment on the proximate causation element of plaintiff's legal malpractice claim was improper.

¶ 114                                F. Appeal to the Commission

¶ 115   Finally, summary judgment was inappropriate because there is record evidence that Fishel promised plaintiff she would appeal the arbitrator's decision to the Commission.

¶ 116   This issue is primarily a question of duty, *i.e.*, whether Fishel and plaintiff had an attorney-client relationship with respect to appealing the arbitrator's decision. See *Lowrey*, 375 Ill. App. 3d at 196. "Whether an attorney-client relationship exists, and thus whether the attorney owes a duty to a particular person, is a question of law." *Meriturn Partners, LLC v. Banner and Witcoff, Ltd.*, 2015 IL App (1st) 131883, ¶ 10. "However, findings of fact often must be made concerning the formation of the attorney-client relationship to, for example, resolve disputes concerning communications, acts undertaken, or the parties' respective understandings." *Id.* Here, whether Fishel and plaintiff had an attorney-client relationship with respect to filing the appeal is a legal question, but it turns on factual disputes about the parties' communications.

¶ 117   The circuit court misunderstood the record on this issue. The court found that plaintiff's claim that Fishel promised to file an appeal to the Commission was a self-serving allegation with no support in the record. But Fishel's e-mail of September 11, 2018, which is attached to plaintiff's summary judgment response as exhibit L, confirms that Fishel made such a promise. In that e-

mail, Fishel told plaintiff, "*I will file the review for you and I will send you the filed copy*. This will buy you some time. However, please understand, that I will not be handling the review for you as I have requested to withdraw as your attorney." (Emphasis added.) Plaintiff has presented record evidence from which a factfinder could conclude that Fishel promised to file the appeal for him and then broke that promise. Of course, Fishel can explain that plaintiff later said he did not want her to file the appeal. But that is a factual dispute a jury must resolve.

¶ 118   Defendants argue that even if Fishel breached her duty to file an appeal to the Commission, plaintiff cannot prove that breach caused him to lose the appeal. But causation is a question of fact. See *Judge*, 221 Ill. 2d at 210. A jury must decide whether Fishel not filing an appeal caused plaintiff to lose an appeal he could have won. Accordingly, we reverse the grant of summary judgment and remand for further proceedings.

¶ 119                               III. CONCLUSION

¶ 120   For the foregoing reasons, we reverse the grant of summary judgment and remand this matter to the circuit court for further proceedings.

¶ 121   Reversed and remanded.